

**Thompson Wigdor LLP** ATTORNEYS AND COUNSELORS AT LAW

85 Fifth Avenue
New York, NY 10003
Tel 212.257.6800
Fax 212.257.6845
www.thompsonwigdor.com

**Kenneth P. Thompson**
kthompson@thompsonwigdor.com

July 23, 2012

**VIA ECF**
The Honorable Nina Gershon
United States District Court Judge
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>Carmichael v. City of New York, et al.; No. 06 Civ. 1913 (NG) (VVP)</u>

Dear Judge Gershon:

We represent Plaintiff Elle Carmichael and write in opposition to the City of New York's (the "City") request for a pre-motion conference regarding a motion for summary judgment. This is an action under 29 U.S.C. § 1983 ("Section 1983") alleging that the New York City Police Department ("NYPD") handles missing persons searches differently based on race. This discriminatory practice led to the NYPD's refusal to search for Ms. Carmichael's daughter, Romona Moore, for three days after she was reported missing, while she was being held against her will, raped, tortured and was ultimately murdered only one block from her friend's home that she had just visited and a few of blocks from her then home. The City's letter is rife with inaccuracies and genuine issues of material fact preclude summary judgment.

**Background**

On Thursday, April 24, 2003, at approximately 7:00 p.m., Ms. Moore left her home at 615 Remsen Avenue in East Flatbush, Brooklyn. She told her mother, Elle Carmichael, that she was going to her friend Gary Williams' home and the Burger King restaurant on her block, and then return home. Ms. Moore was a 21 year old student at Hunter College, had never been in any trouble, and held a job at her former high school, where she was on the honor roll. Ms. Moore had never even spent a night out of the house without informing her mother. Shortly after 7:00 p.m., Ms. Moore arrived at Mr. Williams' residence at 5603 Snyder Avenue and left shortly thereafter to go to Burger King. Before she left, she told Mr. Williams that "she was going to Burger King and that she would call him when she got home." Ms. Moore walked approximately one block when she was grabbed off the street and pulled into the basement of 5807 Snyder Avenue, where she would spend several days being raped and tortured and was ultimately murdered by Troy Hendrix and Kayson Pearson.

The next morning, April 25, 2003 at 9:00 a.m. Ms. Carmichael awoke to find that her daughter had not returned. She called Mr. Williams and was told that Ms. Moore had left the night before after a short visit. Ms. Carmichael then called 911 to report her daughter missing. At approximately 9:30 a.m., Police Officers Richardson, Sweat and Patrol Sergeant Collado arrived. Ms. Carmichael explained that her daughter went to Mr. Williams' residence and Burger King but had not returned.

**Thompson Wigdor LLP** ATTORNEYS AND COUNSELORS AT LAW

*Hon. Nina Gershon*
July 23, 2012
Page 2

She pleaded with the officers that this was completely out of character, that she had never been out all night before, and had no reason to run away. Even a basic inquiry would have revealed that she had left her wallet, bank card and driver's license at home. Moreover, the employees at Burger King had never seen her the night before. Nonetheless, the NYPD "closed" the case and did nothing to search for her for more than three days. While the City claims that the responding officers "canvassed the area," this is *at best* an *extreme* exaggeration of one officer's testimony that was contradicted by the officer who took Ms. Carmichael's missing person report.

Ms. Moore remained alive in the basement of 5807 Snyder Avenue for approximately two-and-a-half days (roughly 60 hours) after the initial report, until she was brutally murdered on the evening of Sunday, April 27, 2003. The police commenced an investigation into her disappearance on April 28, 2003, only due to pressure from local politicians. However, at that point, it was too late.

## Argument

To defeat summary judgment on an Equal Protection claim, Plaintiff need only show issues of fact as to whether (1) Ms. Moore was treated differently than other similarly situated missing persons and (2) "such selective treatment was based on impermissible considerations such as race." *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995). Thus, Plaintiff need only show issues of fact as to whether the response to the missing person complaint for Ms. Moore was handled differently than for similarly situated White people because of her race. Plaintiff can easily make this showing.

First, the NYPD has a written policy governing missing person searches. Among other policies, a person is considered "missing" under "Category G" where the "circumstances indicate an involuntary or unaccountable disappearance." For virtually all missing persons, including Category G, an immediate investigation is required. Thus, whether a person is defined as "missing" following an initial complaint is determinative as to whether an immediate investigation will follow. Plaintiff has submitted an expert report which analyzes NYPD's missing person records and shows that there are far fewer Black persons labeled "missing" than one would expect at statistically significant levels. While Defendants claim this is irrelevant, this is the crux of the case. The City refused to categorize Ms. Moore as "missing," (until much later) and because of that, no immediate investigation was conducted. Per the expert report, the City's refusal to label Ms. Moore "missing" is consistent with the City's custom of underrepresentation of Black missing persons.

Second, Ms. Moore was clearly a "missing" person because her disappearance as "unaccountable or involuntary," but the NYPD refused to search for her. One can hardly imagine circumstances more fitting for Category G than Ms. Moore's. For example, Ms. Moore told *both* her mother and Mr. Williams that she was returning home that night, but she never did. She had never been in any trouble, was an honor roll student, and had never spent the night out before. Moreover, Ms. Moore's personal identification and bank card was left at the house and she had never been seen at her intended destination of Burger King that night. Clearly, Ms. Moore's failure to return home was highly unusual.

**Thompson Wigdor LLP** ATTORNEYS AND COUNSELORS AT LAW

*Hon. Nina Gershon*
July 23, 2012
Page 3

Third, one month before, in March 2003, a White woman, Svetlana Aronov, who was married to a doctor on the Upper East Side of Manhattan went missing under nearly identical circumstances. Ms. Aronov left her apartment at 3:30 p.m. to walk the dog. At 10:30 p.m., when her husband arrived home and noticed she was not there, he reported her missing. The NYPD immediately labeled her "Category G." Within only *three hours* of the initial report (and in the middle of the night) the NYPD canvassed the area, checked of local hospitals and morgues, checked the shoreline, searched rooftops by helicopter, reviewed security video footage, and deployed a bloodhound. Ms. Aronov and Ms. Moore were treated entirely differently under virtually identical circumstances.

The City strangely claims that Plaintiff "can adduce no evidence whatsoever that the discretionary decision by the police . . . was made because of her race." Plaintiff need not show discriminatory intent of the individual actors under *Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978). Under *Monell*, regardless of an individual's intent, where the conduct of a municipality's employees demonstrates the effective existence of an unwritten policy, municipal liability may arise. *See Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) ("It is sufficient to show, for example, that a discriminatory practice . . . was so persistent to widespread as to constitute a custom"). Plaintiff's expert shows that the City has a custom of refusing to conduct immediate investigations for Black missing persons. Issues of fact as to the City's acquiescence to discriminatory missing person searches clearly exist based on the above-described evidence.

Lastly, Plaintiff can prove causation. The police would have had about 60 hours to locate Ms. Moore to save her life. Had an immediate investigation commenced, the route she was thought to have last walked (from Mr. Williams' residence to Burger King a few blocks away), and where she was being held captive, would have been canvassed. In fact, when an investigation for Ms. Moore commenced on April 28, 2003, the first step was to canvas her route. Moreover, had a bloodhound team been deployed (as was for Ms. Aronov), Plaintiff's bloodhound expert states that there is a high likelihood that Ms. Moore would have been found only one block away. While the City derisively refers to Dr. Lisa Harvey, as a "community college teacher," she has a B.A. in Chemistry and Biology, an M.S. in Physiology and Forensic Science and a Ph.D. in Physiology, and she has published the only known scientific study on bloodhound scent abilities.

Therefore, Plaintiff can clearly establish the existence of a discriminatory custom in NYPD's missing person searches. The refusal to label Ms. Moore "missing" and conduct any immediate search for her is consistent with this custom. Had an immediate search been commenced, there are genuine issues of material fact from which a jury could determine her life could have been saved. Thus, no pre-motion conference is necessary as the City's motion is meritless.

Respectfully submitted,

*/s/ Kenneth P. Thompson*

Kenneth P. Thompson

cc: Arthur Larkin, Esq.
 A. Lorenzo Bryan, Esq.