UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

ELLE CARMICHAEL, as Administratix of the Estate of Romona Moore,

                                  Plaintiff,

      -against-

THE CITY OF NEW YORK, et al.,

                                  Defendants.

------------------------------------------------------------------------ X

**STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1**

06-CV-1913 (NG) (VVP)

       Defendant City of New York, as and for its Statement Pursuant to Local Civil Rule 56.1, for purposes of this summary judgment motion only and no other purpose, including trial of this matter, states as follows:

       1.     In April, 2003, plaintiff Elle Carmichael lived with her daughter Romona Moore, and others, at 615 Remsen Avenue in Brooklyn. (Exhibit A [Carmichael Dep.], at 8)[1]

       2.     Ms. Moore was born in October, 1981, and was twenty-one (21) years of age at that time. (*Id*. at 9-10)

       3.     On the evening of Thursday, April 24, 2003, Ms. Moore told her mother she was going to the Burger King about half a block away from their home, and left the house at approximately 7:00 p.m. (*Id*. at 12, 15:20)

       4.     Before leaving the house, Romona did not tell her mother that she was going to see her friend, or boyfriend, whose name was Gary Williams. (*Id*. at 8:16-19)

---

[1] All references are to the exhibits attached to the accompanying declaration of Arthur G. Larkin, submitted with this motion.

  5. The Burger King was located on the corner of Remsen Avenue and Church Avenue.  (*Id*. at 13)

  6. Ms. Moore did not return that evening.  (*Id*. at 14)

  7. At approximately 9:00 a.m., on the morning of Friday, April 25, 2003, Ms. Carmichael called the police to report that her daughter was missing.  (*Id*.)

  8. She called the 67th Precinct at that time.  (*Id*. at 15)

  9. She was informed by someone at the Precinct to call 911 instead, and accordingly she did so.  (*Id*.)

  10. She told the 911 operator that her 21-year old daughter had left home the night before at approximately 7:00 p.m., said she was going to Burger King and did not return, and that she was concerned something was wrong.  (*Id*. at 15:16-22)

  11. Two officers responded to 615 Remsen Avenue after Ms. Carmichael placed her call to 911.  (*Id*. at 16)

  12. One of them was Police Officer Monique Richardson.  (*Id*.)

  13. Ms. Carmichael told Officer Richardson that her daughter, Romona Moore, had left home the prior evening at 7:00 p.m., to go to Burger King and that she did not return, that Romona was a "delicate child" and that Ms. Carmichael really did believe something was wrong because she did not come home.  (*Id*. at 17)

  14. Ms. Carmichael also told Officer Richardson that Romona attended Hunter College, that she had gone to register for her classes the day before, April 24th, that Romona was quiet, respectful and easy-going, and that it was unusual and uncharacteristic of her to go out and not call or come back in such a long time.  (*Id*. at 17-18)

15. Finally, Ms. Carmichael told Officer Richardson that she had called Gary Williams' house and he said that Romona was there the night before. (*Id.* at 18)

16. Ms. Carmichael did not tell Officer Richardson Gary's full name at that time. (*Id.*)

17. In response to the information Ms. Carmichael had told Officer Richardson, the latter replied, in substance, that because Romona was 21 years of age she would file a report at the precinct, for informational purposes, but that it will not be filed as a missing persons report; that a missing persons report would only be filed if Romona were sixteen (16) years of age or younger; and that since Romona was 21 years old she was free to go wherever she wanted and the police could not do anything about it. (*Id.* at 18-19)

18. As Officer Richardson was leaving Ms. Carmichael's house, she told her that it takes twenty-four hours for any action to be taken on a missing person complaint, and that if she was still concerned about her daughter's absence she should call the precinct at 7:00 p.m., that night. (*Id.* at 20)

19. At 7:00 p.m. that night, Ms. Carmichael called the 67th Precinct and spoke to Detective Patrick Henn. (*Id.* at 21)

20. She told Det. Henn that two officers had come to her home earlier in the day because she reported her daughter missing, and one of the officers asked her to call the precinct at 7:00 p.m., which would be twenty-four (24) hours after her daughter had left home. (*Id.* at 21)

21. She also asked Det. Henn if an investigation was going to be conducted into her daughter's disappearance. (*Id.*)

22. Det. Henn told Ms. Carmichael in words or substance, and in a "nasty manner," that since her daughter was 21 years old, she could go anywhere she wished; that the officer who took her report did not follow proper procedure; and that she should never call the precinct again. (*Id.* at 21-22)

23. On the morning of Saturday, April 26, 2003, Ms. Carmichael visited the 67th Precinct. (*Id.* at 26)

24. Her sister Marjorie Mann, her brother-in-law Clifford Mann, her nephew Troy Mann and her niece, Shawndell Terry, accompanied her there. (*Id.* at 28)

25. She spoke to a detective named Hutchinson at that time. (*Id.*)

26. She told him about the way she had been treated when she called the night before, and pleaded with him to help her find her daughter. (*Id.* at 26-7)

27. She also told him that Romona's disappearance is very unusual; that she was an A-1 student, quiet and easy-going; that she would not just leave and stay away from home until Saturday; and asked him to call Gary's house to see if something was wrong when she visited him there. (*Id.* at 27)

28. Det. Hutchinson told Ms. Carmichael that he could not call Gary's house; that Romona Moore was 21 years old and there was nothing he could do; and told her to look outside to see how many missing persons posters were there. (*Id.*)

29. Ms. Carmichael was at the 67th Precinct for approximately fifteen minutes on Saturday, April 26, 2003. (*Id.* at 29)

30. On Monday, April 28, 2003, at approximately 9:00 a.m., Ms. Carmichael visited the office of her Assemblyman, Nick Perry, to ask for his help. (*Id.*)

31. While in Mr. Perry's office, a young gentleman who worked there called the 67th Precinct in Ms. Carmichael's presence, told whoever he spoke with that Ms. Carmichael, a constituent, was in his office, having reported her daughter missing, and he asked the police to investigate the disappearance. (*Id*. at 31-32)

32. At approximately 2:00 p.m. the same day, April 28, 2003, someone from the 67th Precinct (a male other than Det. Henn or Det. Hutchinson) called Ms. Carmichael, and asked her why she was calling public officials and asking them to call the police, telling them to look for her daughter. (*Id*. at 33-34)

33. Also on April 28, 2003, Det. Wayne Carey of the 67th Precinct called Ms. Carmichael to say that he would be coming over to her house to follow-up on her report of her missing daughter Romona Moore. (*Id*. at 36-7)

34. He had been assigned the case that day by his supervisor, Lt. Robert Casazza. (Exhibit B [Carey Dep.], at 160-61)

35. Up until that time, Romona Moore's disappearance had not been considered a "Category G" missing persons case by the NYPD. (*See* Exhibit A [Carmichael Dep.], at 18-22, 26-29; Exhibit C [NYPD Patrol Guide 203-27])

36. Det. Carey asked Ms. Carmichael what time Romona left home on April 24th, what school she attended, and asked to see her room; he also took her social security card and bank card. (Exhibit A [Carmichael Dep.], at 37-8, 39:1-6)

37. Det. Carey was at Ms. Carmichael's home for approximately twenty minutes. (*Id*. at 38)

38. Det. Carey did not ask Elle Carmichael, at any time, whether she wanted publicity for her daughter's absence. (Exhibit B [Carey Dep.], at 208-10)

5

39. Det. Carey never sought publicity for any missing persons case he worked on, at any time, while employed as an NYPD detective. (*Id*. at 211:19-25)

40. Prior to April 28, 2003, other parents in missing persons cases had told Det. Carey, in substance, that their child had never disappeared before and would not do something like that. (*Id*. at 231)

41. In his experience, parents made statements like that for their own reasons. (*Id*. at 231:21-22 ("Sometimes parents don't want to tell you that their children are on the wild side"))

42. Moreover, in such cases, Det. Carey often learned that the missing persons were runaways or had just gone out with their friends for the night. (*Id*.)

43. For this reason, he did not believe that Ms. Carmichael's telling the NYPD that Romona Moore had not disappeared before and would not do something like that necessarily suggested that Romona Moore's disappearance was unique or unusual. (*Id*. at 230-31)

44. After leaving Ms. Carmichael's home, Det. Carey went back to the precinct and called Gary Williams' residence. (*Id*. at 304-5)

45. He had obtained Mr. Williams' phone number from Elle Carmichael earlier in the day. (*Id*. at 280-81)

46. He visited Mr. Williams and learned, among other things, that Romona Moore had come to his apartment on the evening of April 24, 2003, stayed for a while and then left, telling him that she was going to Burger King. (*Id*. at 305-6)

47. Det. Carey then went to the Burger King about half a block away from Ms. Carmichael's home and spoke to a cashier there who knew Romona Moore. (*Id*. at 307)

6

48. The cashier told Det. Carey that Romona Moore did not come into the Burger King the previous Thursday, April 24, 2003. (*Id.*)

49. Det. Carey then went back to the precinct and started calling Romona Moore's friends from school, whose names and phone numbers Elle Carmichael had supplied to him. (*Id.* at 310)

50. In addition to the activities described above, Det. Carey also took the following investigative steps: (i) he searched Romona Moore's bedroom, (ii) utilized NYPD computer databases to see if she had been arrested, hospitalized, or if she had been reported the victim of an accident, (iii) canvassed City hospitals and morgues, (iv) put out a description of Ms. Moore over the NYPD central radio and reported her as a missing person, (v) canvassed Ms. Moore's neighborhood to find out if anyone had seen her recently, (vi) requested a canine search for Ms. Moore, (vii) subpoenaed records from various banks to see if there had been unusual activity on her bank card, (viii) arranged for an ESU search of Gary Williams' residence, at 5603 Snyder Avenue, Brooklyn, and (ix) interviewed numerous persons including Ramando Jack. (*Id.* at 321-44)

51. On April 29, 2003, Det. Carey took a statement from a woman who had been abducted and raped at 5807 Snyder Avenue, an address within the 67th Precinct in Brooklyn. (Exhibit D [3/13/06 Trial excerpt, People v. Troy Hendrix, Indictment # 3668/03], at 1243)

52. Det. Carey was thereafter assigned to investigate the crimes committed against the victim. (*Id.*)

53. On May 21, 2003, after investigating those crimes and apprehending Troy Hendrix as one of the perpetrators, Det. Carey interviewed Kaysan Pearson at St. Joseph's

Hospital in Yonkers.  (Exhibit E [3/15/06 Trial excerpt, People v. Troy Hendrix, Indictment # 3668/03], at 1649)

54. Pearson told Det. Carey, in substance, that he and Troy Hendrix had kidnapped and raped Romona Moore during April 24-26, 2003.  (*Id*. at 1661-5)

55. He also told Det. Carey that Hendrix killed Ms. Moore using a hammer, and that he and Hendrix had disposed of her body in the early morning hours (at approximately 2:00 a.m.) on Sunday, April 27, 2003.  (*Id*. at 1663-5)

56. By the time Det. Carey interviewed Pearson, the police already had found Romona Moore's body, on or about May 10, 2003.  (*See* DE 1 [Complaint], ¶ 20)

57. In or about March, 2006, Hendrix and Pearson were convicted of kidnapping, rape and murder in connection with Romona Moore's killing, and were sentenced to terms of life in prison.  (*See id*., ¶ 16; *see generally* www.doccs.ny.gov (New York State Department of Correction web page), Inmate Lookup)

58. On or about April 30, 2003, NYPD canine officer Jonathan Figueroa attempted to search for Romona Moore.  (Exhibit F [Figueroa Dep.], at 147-48)

59. Officer Figueroa has been assigned to the NYPD canine unit from 1998 to the present.  (*Id*. at 19)

60. During his entire tenure with the canine unit, he has successfully located one missing person, a male on Staten Island, utilizing a canine named Bella.  (*Id*. at 110)

61. At the end of 2002, approximately, Officer Figueroa began working with a bloodhound named Kojak.  (*Id*. at 36)

62. He utilized Kojak in connection with the unsuccessful search for Romona Moore.  (*See id*.)

63. At no time prior or subsequent to April 30, 2003, did Officer Figueroa ever locate a missing person utilizing Kojak. (*See id.*)

64. In or about March, 2003, a Caucasian woman named Svetlana Aronov, who lived in Manhattan and was approximately 44 years of age, and married, left home to walk her dog. (Exhibit G [Aronov complaint report, missing persons report])

65. She did not return and was reported missing by her husband. (*Id.*)

66. The NYPD opened an investigation the same night she was reported missing. (*See id.*)

Dated:   New York, New York
         February 22, 2013

                                MICHAEL A. CARDOZO
                                Corporation Counsel of the
                                  City of New York
                                Attorney for Defendants
                                100 Church Street
                                New York, New York 10007
                                (212) 788-1599

                      By:           /s/
                              Arthur G. Larkin (AL 9059)
                              Senior Counsel

TO:   All Counsel (by ECF)