**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- X

ELLE CARMICHAEL, as the Administratix of the : 
Estate of Romona Moore, :

         :   No. 06 Civ. 1913 (NG)(VVP)

               Plaintiff, :

              :

         v. :

              :

CITY OF NEW YORK, et al., :

              :

            Defendants. :

              :

              :

---------------------------------------------------------------- X

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR <u>SUMMMARY JUDGMENT</u>

THOMPSON WIGDOR LLP

85 Fifth Avenue
New York, New York 10003
Phone: (212) 257-6800
Facsimile: (212) 257-6845

*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

      Background ......................................................................................................... 3

      Elle Carmichael's Missing Person Complaint ................................................... 3

      The New York City Police Department Patrol Guide ....................................... 5

      Inaction By the NYPD In Searching For Romona Moore ................................. 6

      Statistical Analysis of the City's Missing Person Practices............................... 7

      The Search for Svetlana Aronov .................................................................... 8

ARGUMENT ........................................................................................................... 9

  I.    SUMMARY JUDGMENT STANDARD ................................................. 9

  II.   PLAINTIFF CAN ESTABLISH STATE ACTION ................................. 9

  III.  PLAINTIFF IS NOT ALLEGING ENTITLEMENT TO "ADEQUATE
       POLICE INVESTIGATION"................................................................... 11

  IV.  PLAINTIFF CAN ESTABLISH ISSUES OF FACTS AS TO HER EQUAL
       PROTECTION CLAIMS ......................................................................... 12

      A.  Overview of Equal Protection Claims under Section 1983 ................... 12

      B.  Plaintiff Can Establish Discriminatory Intent...................................... 14

          1.  Evidence of Widespread Discrimination Through Statistical Analysis.....14

          2.  Disparate Treatment of Ms. Moore and Ms. Aronov................................ 18

  V.   PLAINTIFF CAN ESTABLISH CAUSATION ...................................... 21

      A.  Relevant Standard ............................................................................... 21

      B.  Plaintiff Can Establish Material Issues of Fact As to Whether a Door-to-Door
         Canvas Would Have Located Ms. Moore............................................... 21

i

C.  Plaintiff Can Establish Material Issues of Fact As to Whether a Bloodhound Search Would Have Located Ms. Moore ..............................................................23

VI.  PLAINTIFF CAN ESTABLISH A SECTION 1981 CLAIM ....................................25

CONCLUSION ..........................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

Ackerman v. Oryx Communications, Inc.,
  810 F.2d 336 (2d. Cir. 1987) ............................................................................18

Anderson v. City of New York,
  817 F. Supp. 2d 77 (E.D.N.Y. 2011) ...............................................................25

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) .............................................................................................9

Allen v. City of New York,
  466 F.Supp.2d 545 (S.D.N.Y. 2006) ................................................................17

Bazemore v. Friday,
  478 U.S. 385 (1986) ...........................................................................................17

Bielevicz v. Dubinon,
  915 F.2d 845 (3d Cir. 1990) ..............................................................................21

Borawick v. Shay,
  68 F.3d 597 (2d Cir.1995) .................................................................................17

Boucher v. Suzuki Motor Corp.,
  73 F.3d 18 (2d. Cir. 1996) .................................................................................18

Cohalan v. Genie Industries, Inc.,
  10 Civ. 2415(JMF), 2013 WL 829150 (S.D.N.Y. Mar. 1, 2013) ...............17, 20

DeShaney v. Winnebago County Dep't of Soc. Serv.,
  489 U.S. 189 (1989) ...........................................................................................11

Elliot-Park v. Manglona,
  592 F.3d 1003 (9th Cir. 2010) ...........................................................................11

Estate of Macias v. Ihlde,
  219 F.3d 1018 (9th Cir 2000) ............................................................................10

Floyd v. City of New York,
  813 F. Supp.2d 417(S.D.N.Y. 2011) .................................................................13

George v. City of Long Beach,
  973 F.2d 706 (9th Cir.1992) ..............................................................................21

Guardians Assoc. of New York City Police Dep't, Inc. v. Civil Serv. Comm.,
        630 F.2d 79 (2d Cir. 1980)..................................................................................16

Hardy v. Greenwich,
        06-CV-833(MRK), 2008 WL 5117370 (D.Conn. Dec. 3, 2008)......................................13

Harrington v. County of Suffolk,
        607 F.3d 31 (2d Cir. 2010)..................................................................................11

Hilton City v. Wheeling,
        209 F.3d 1005 (7th Cir. 2000) ..........................................................................11

Joseph S. v. Hogan,
        06-cv-1042 (BMC)(SMG), 2011 WL 2848330 (E.D.N.Y. July 15, 2011)........................17

Ligon v. City of New York,
        12 CIV 2274 (SAS), 2013 WL 628534 (S.D.N.Y. Feb. 14, 2013)...................................13

M.O.C.H.A. Society, Inc. v. City of Buffalo,
        98-CV-99 (JTC), 2007 WL 3354211 (W.D.N.Y. Nov. 9, 2007)......................................13

Malave v. Potter,
        320 F.3d 321 (2d Cir. 2003)..................................................................................16

McKee v. Rockwall, Tex.,
        877 F.2d 409 (5th Cir. 1989) ..........................................................................13

Miner v. City of Glen Falls,
        999 F.2d 655 (2d Cir. 1993)..................................................................................21

Monell v. Dep't of Soc. Servs. of City of New York,
        436 U.S. 658 (1978)..............................................................................12, 13, 16

Neighborhood Action Coalition v. City of Canton, Ohio,
        882 F.2d 1012 (6th Cir. 1989) ..........................................................................11

Olivera v. Town of Woodbury,
        281 F.Supp.2d 674 (S.D.N.Y. 2003)......................................................................25

Patterson v. County of Oneida,
        375 F.3d 206 (2d Cir. 2004)..................................................................................12

Pyke v. Cuomo,
        258 F.3d 107 (2d Cir. 2001)..................................................................................10

Reynolds v. Barrett,
    685 F.3d 193 (2d Cir. 2012)............................................................16

Reynolds v. Giuliani,
    506 F.3d 183 (2d Cir. 2007)............................................................12

Schroeder v. Hamilton Sch. Dist.,
    282 F.3d 946 (7th Cir. 2002) ..........................................................12

Smith v. Gilpin County, Colo.,
    949 F. Supp. 1498 (D. Colo. 1996)..................................................20

Sybalski v. Indep. Grp. Home Living Program, Inc.,
    546 F.3d 255 (2d Cir. 2008)............................................................10

Tancredi v. Metropolitan Life Ins. Co.,
    316 F.3d 308 (2d Cir. 2003)............................................................10

The Comm. Concerning Cmty. Improvement v. City of Modesto,
    583 F.3d 690 (9th Cir. 2009) ..........................................................20

Trudeau v. Wyrick,
    713 F.2d 1360 (8th Cir. 1983) ........................................................21

United States v. City of New York,
    683 F.Supp.2d 225 (E.D.N.Y. 2010) .........................................15, 16

United States v. City of Yonkers,
    96 F.3d 600 (2d Cir. 1996)..............................................................13

Village of Arlington Heights v. Metro. Hous. Dev. Corp.,
    429 U.S. 252 (1977).................................................................12, 13

Waisome v. Port Auth. of New York & New Jersey,
    948 F.2d 1370 (2d Cir. 1991)..........................................................16

Washington v. Davis,
    426 U.S. 229 (1976).......................................................................12

Watson v. City of Kansas City,
    857 F.2d 690 (10th Cir. 1988) ................................................. *passim*

Wright v. City of Ozark,
    715 F.2d 1513 (11th Cir. 1983) ......................................................10

Yick Wo v. Hopkins,
    118 U.S. 356 (1886)........................................................................................................11

## **STATUTES**

Fed. R. Civ. P. 56................................................................................................................9

Fed. R. Civ. P. 702............................................................................................................25

Plaintiff Elle Carmichael, as Administrator of the Estate of Romona Moore, submits this Memorandum of Law in Opposition to the City of New York's ("Defendant" or the "City") Motion for Summary Judgment.  For the foregoing reasons, the City's motion should be denied.

## PRELIMINARY STATEMENT

This is a civil rights case that strikes the heart of the Equal Protection Clause of the United States Constitution.  On a broad public level, this case is about the City's discriminatory treatment of Black people with regard to the New York City Police Department's ("NYPD") missing person searches.  This case seeks to hold the City accountable for the disparate manner in which Black missing persons are searched for compared to similarly situated non-Black missing persons.  On an individual level, this case is about a mother pursuing justice for her deceased daughter who was repeatedly raped, tortured and ultimately murdered, while the NYPD knew she was missing under highly suspect and unusual circumstances, and would have easily located her from even a basic search, but refused to conduct any search for her whatsoever for days while she was alive.  Ms. Carmichael seeks to ensure the same tragedy does not happen to Black others.

The events underlying this case are tragic not only because Ms. Moore, a determined young woman with a bright future, was murdered, but because she could still be alive today had the NYPD acted in a non-discriminatory manner and searched for Ms. Moore following her mother's missing person report.  The circumstances surrounding Ms. Moore's disappearance were highly unusual and extremely suspicious by any standard.  Per the NYPD's own policy, a search for Ms. Moore should have commenced immediately following Ms. Carmichael's missing person report given that Ms. Moore's disappearance was clearly unaccountable, involuntary and unusual.  Yet, the NYPD refused to engage in any search or take any investigative action whatsoever for more than three days.  The NYPD officially "closed" the missing person's report the very same day it was filed.

When the NYPD finally did investigate Ms. Moore's disappearance (only after pressure from local politicians), Ms. Moore's life had already been taken.

The NYPD's failure to search for Ms. Moore is particularly glaring when compared to the NYPD's immediate response to a nearly identical missing person report filed for a White woman named Svetlana Aronov only a month earlier. Despite the fact that the missing person report was filed by Ms. Aronov's husband at 11:30 p.m., Ms. Aronov was the subject of an instantaneous and massive NYPD search and investigation. The immediate search for Ms. Aronov included, but was not limited to, a door-to-door foot canvass, the use of a police bloodhound, interviews with Ms. Aronov's friends, family, neighbors and those who last saw her, a review of security footage from the area and phone and financial records, distribution of fliers, a press conference, deployment of police vans playing information about Ms. Aronov's disappearance over a loudspeaker, and pursuing virtually every lead and tip made to the NYPD. Had even a small portion of these investigative steps been taken in an immediate search for Ms. Moore, police officers would have been led directly to where Ms. Moore was being held, in time to spare her life.

Further, the NYPD's failure to conduct immediate searches for Black missing persons is supported by a detailed statistical analysis of the NYPD's missing person's data which demonstrates statistically significant disparities between the rates at which the NYPD reports Black adults as "missing" versus the rate it labels non-Blacks as "missing." Blacks are labeled "missing" at a far lower rate than that which would be expected, and which cannot be merely explained away by chance. This strikes the heart of Plaintiff's claims, as the NYPD, per its own policy, conducts immediate investigations for virtually all persons it labels "missing." It necessarily follows that the failure to categorize Black missing persons as officially "missing," at a statistically significant differential to non-Black missing persons, results in the discriminatory failure to conduct immediate investigations for Black missing persons, resulting in tragedies such as the Ms. Moore tragic death.

**STATEMENT OF FACTS**[1]

**Background**

On Thursday, April 24, 2003, at approximately 7:00 p.m., Ms. Moore left her home at 615 Remsen Avenue in Brooklyn, New York, and told her mother, Elle Carmichael, that she would be going to the Burger King (located less than a block from their home), and then return home soon thereafter.  ¶ 79.  Ms. Moore was a 21 year-old successful and dedicated student at Hunter College.  ¶¶ 94, 109.  Ms. Moore had never been in any trouble, legal or otherwise, held a part-time job at a high school near her college, and had received numerous honors in recognition of her achievements throughout her academic career.  ¶¶ 104 – 106.  Ms. Moore was an ideal daughter and young adult, despite growing up under difficult circumstances in East Flatbush, Brooklyn.

Shortly after leaving, Ms. Moore stopped off at her friend Gary Williams' home, located at 5603 Snyder Avenue, a few short blocks away.  ¶¶ 79, 81.  She stayed there just about ten to fifteen minutes.  ¶ 83.  As she left, Ms. Moore told Mr. Williams that she was on her way to Burger King and would call him when she got home.   ¶ 83.  Ms. Moore walked only approximately a block in the direction of Burger King when she was kidnapped and pulled into the basement of 5807 Snyder Avenue by Troy Hendrix and Kayson Pearson.  ¶¶ 85, 88.  This is where she would spend the final days of her life – one block from where she was last seen alive – being raped, tortured and ultimately murdered.

**Elle Carmichael's Missing Person Complaint**

When Ms. Moore failed to return home later that evening, Ms. Carmichael grew concerned about Ms. Moore's whereabouts.  ¶ 88.  The next morning, April 25, 2003, Ms. Carmichael called Mr. Williams' residence and was told that her daughter had been there the night before, but that she left after only a brief stay.  ¶¶ 83, 96.  Ms. Carmichael also contacted a number of Ms. Moore's

---

[1]      Plaintiff's Rule 56.1 Counter-Statement is referred to herein as "¶__."

friends, asking if they knew where Romona was. ¶ 96.   At approximately 9:00 a.m., Ms. Carmichael called the 911 and her local police precinct to report Ms. Moore missing.  ¶ 89.

At 9:30 a.m., NYPD Officers Monique Richardson and Eason Sweat of the 67th Precinct arrived at Ms. Carmichael's home.  ¶ 90.  Ms. Carmichael explained that her daughter had left to go to the Burger King on her block the previous evening, stopped off at her friend Gary Williams' home, but never returned home.  ¶¶ 91, 96.  Ms. Carmichael also explained that her daughter was a responsible woman, a student at Hunter College who had just registered to take summer classes, and that it was highly unusual for her to be unaccounted for such a long period of time, as she had never stayed out all night before.  ¶¶ 92 - 95.  Ms. Carmichael pleaded to Ofc. Richardson for help because it was completely out of character for Ms. Moore to be missing.  ¶¶ 95, 98. Ms. Moore had never been in any trouble and had no reason to run away.  ¶¶ 80, 95.

Even the most basic, preliminary investigation would have revealed numerous additional facts to bolster the unaccountable nature of her disappearance.  Ms. Moore had left her wallet, identification, bank card and passport at home. ¶¶ 100, 103.  Employees at the Burger King had not seen her the night before.  ¶ 87.  Most importantly, if the NYPD had simply contacted Mr. Williams - the last person to see Ms. Moore - they would have learned that she told him she would call when she got home, but never did.  ¶¶ 83, 134, 151.  These were all giant red flags indicating the highly suspect and unusual nature of Ms. Moore's disappearance that the NYPD simply ignored.

However, contrary to NYPD policy, Ofc. Richardson told Ms. Carmichael that she could not even open an investigation or search for Ms. Moore because Ms. Moore was over 18 years of age.  ¶¶ 109, 110, 113.  Ofc. Richardson also told Ms. Carmichael that she could not open an investigation until 24 hours had passed.  ¶ 111.  During this time, Patrol Sergeant Angel Collado also arrived at 615 Remsen Avenue.  ¶ 107.  Ofc. Richardson related to Sgt. Collado what Ms. Carmichael had informed her regarding Ms. Moore's disappearance; however, Sgt. Collado too

refused to open any investigation.  ¶¶ 115, 116.  Therefore, after spending just a brief moment with Ms. Carmichael, Offcs. Richardson and Sweat simply returned to the 67th  Precinct without conducting any search.  ¶ 118.

**The New York City Police Department Patrol Guide**

Section 207-23 of the NYPD Patrol Guide (the "Patrol Guide") sets forth the procedures to be followed in a missing person investigation. ¶¶ 67.  The Patrol Guide defines a "missing person" as someone who is "missing from a New York City residence" and is:

> (a)  Under eighteen (18) years of age, or
> (b)  Mentally or physically impaired to the extent that hospitalization
>       may be required, or
> (c)  Senile, retarded or disabled and not capable of self-care or clear
>       communication, or
> (d)  Sixty-five (65) years of age or older, or
> (e)  Possible victim of drowning, or
> (f)  Indicated an intention of committing suicide, or
> **(g)  *Absent under circumstances indicating unaccountable or
>       involuntary disappearance.***

¶¶ 67 (emphasis added).   The Patrol Guide does not provide any specific guidance on when or under what circumstances a missing person should be labeled Category G.  Id.  Rather, the determination is made on a case-by-case basis.  Id.  No 24-hour or other time period is required to pass before a search for a missing person will be initiated.  ¶¶ 69, 111.  Furthermore, the Patrol Guide makes it explicitly clear that for certain "special category" missing person cases, *an*

"**IMMEDIATE INVESTIGATION AND/OR SEARCH IS REQUIRED**."  ¶¶ 70 (emphasis in original).  These "special category" cases are:

> (a)  Child under sixteen (16) years of age,
> (b)  Mentally/physically impaired
> (c)  Senile, retarded or disabled,
> (d)  Sixty five years of age or older,
> (e)  *Unique/unusual case, or*
> (f)  *Missing under circumstances indicating unaccountable or
>       involuntary disappearance*
> (g)  Possible drowning victim

5

¶ 70 (emphasis added). Virtually every person that fits within the definition of a "missing person" is entitled to an "immediate search and/or investigation."[2] Thus, whether the NYPD labels an individual "missing" following a missing person report will be determinative as to whether an immediate search and/or investigation will be carried out by the NYPD.

**Inaction By The NYPD In Searching For Romona Moore**

Despite numerous factors demonstrating that Ms. Moore's disappearance was unaccountable, involuntary, unique and unusual (thus falling under Category G and Special Categories E and F), the NYPD determined that Ms. Moore did not even fit the *definition* of a missing person.  ¶¶ 67, 109, 117.  Accordingly, Ms. Carmichael's missing person complaint was marked "closed" on the same day Ms. Carmichael filed it (April 25, 2003), without a single member of the NYPD taking any steps to look for Ms. Moore (¶¶ 116 - 122, 127, 136, 137, 148), effectively sealing Ms. Moore's fate.

Later that day, at 7:00 p.m., Ms. Carmichael called the 67th Precinct and spoke to Detective Patrick Henn about her missing person complaint.  ¶¶ 128, 129.  Det. Henn informed Ms. Carmichael that she should not have even been permitted to file a missing person report, and that she should not call the precinct ever again because nothing can be done to help her.  ¶¶ 128, 129. Ms. Moore was still alive at this time.  ¶¶ 153, 155.

The following morning, Saturday, April 26, 2003, Ms. Carmichael went with family members to the 67th Precinct and spoke to Detective Hutchinson. ¶ 132.  She pleaded once again for the NYPD to help her find her daughter.  ¶¶ 132, 133.  Det. Hutchinson told Ms. Carmichael that there was nothing the police could do, as the case had already been marked "closed."  ¶¶ 134, 135, 136. Ms. Moore was still alive at this time. ¶¶ 153, 155.

---

[2]     The only "missing person" who would not be afforded an immediate investigation under the Patrol Guide would be an individual over the age of 16 but under the age of 18, who did not also fall under one of the other missing person categories.

As a result of the NYPD's inaction, Ms. Carmichael asked local politicians for help.  ¶¶ 138 - 140.  Finally on Monday, April 28, 2003, at approximately 4:30 p.m., the NYPD, caving to political pressure, re-opened Ms. Carmichael's missing persons complaint.  ¶¶ 142 - 144, 146, 147.  At that time, approximately three-and-a-half days had elapsed since Ms. Carmichael's report. ¶¶ 89, 147, 137.  By that time, it was already too late.

## Statistical Analysis of the City's Missing Person Practices

The NYPD compiles data regarding missing person investigations.  During discovery, the City produced the entire database of information regarding missing person investigations from January 2000 through May 2003.  A detailed statistical analysis of the missing persons database conducted by Dr. Mark Killingsworth, Professor of Economics at Rutgers University, shows that there are sizeable and statistically significant shortfalls of Blacks amongst adults 18+ who were labeled as "missing" by the NYPD in that timeframe relative to the figure expected based on appropriate benchmarks.  Ex. RR[3], at ¶¶ 10, 12, 15, 16, 19 . Moreover, there is a statistically significant shortfall of adult Blacks amongst those labeled as "missing" in the City's boroughs with the highest Black and "missing persons" populations – Brooklyn, The Bronx, and Queens – both for persons 18+ and 21+ relative to national and local benchmarks.  Id.  These shortfalls cannot merely be explained away as the product of chance.  Id. at Tables 3-7.

This statistical disparity, explained in more depth below, strongly supports Plaintiff's theory that the NYPD has a widespread practice of under-labeling Blacks who are reported missing as "missing persons," resulting in the failure to conduct an immediate investigation into their disappearances.  This analysis is particularly poignant given the NYPD's failure to immediately label Ms. Moore as "missing," in spite of the unusualness of her sudden disappearance.  The NYPD had a wholly opposite response to the missing person report for Svetlana Aronov.

---

[3]       Exhibits attached to the Thompson Declaration will be referenced herein as "Ex. __".

**The Search For Svetlana Aronov**[4]

In the month before Ms. Moore's disappearance, on March 3, 2003, a White adult woman named Svetlana Aronov went missing on the Upper East Side of Manhattan.  ¶ 173.  Ms. Aronov was last seen at about 2:00 p.m. that day as she left her apartment to walk her dog. ¶ 174.  Like Ms. Moore, Ms. Aronov was an emancipated adult over the age of 21, and was fully expected to return home.  ¶¶ 173, 174, 175.  At approximately 11:30 p.m. that evening, Ms. Aronov's husband – Dr. Alexander Aronov – arrived home and found that she was not there.  ¶ 173.  Similar to Ms. Moore, Ms. Aronov left behind numerous personal items indicating her intent to return home soon, including a purse with her wallet, identification, credit card, money and ATM cards.  ¶¶ 174, 175.  Dr. Aronov then called 911 to report Ms. Aronov missing. ¶ 173.

The NYPD's response to Dr. Aronov's missing person complaint was swift, immediate and massive.  ¶¶ 177-189.  Ms. Aronov's was immediately classified as a "Category G" missing person, prompting the NYPD to initiate a "Level 1" mobilization, which included an immediate door-to-door foot canvass of the area Ms. Aronov was last seen and/or believed to have walked, as well as a search of her building.  ¶¶ 178, 180, 181, 182.   NYPD personnel also collected and reviewed security footage from nearby buildings, and even conducted a helicopter search of rooftops and the East River shoreline.  ¶¶ 185, 186  Incredibly, even though the missing person report was filed close to midnight, approximately four and a half hours after later, the NYPD deployed a bloodhound to search for Ms. Aronov.  ¶¶ 173, 181.  The NYPD also held a press conference the very next day seeking the public's help.  ¶ 184.  The NYPD also assigned multiple detectives to work solely on this case on a full-time basis. ¶¶ 177, 180, 187.  The NYPD even displayed posters and distributed

---

[4]     Magistrate Judge Viktor V. Pohelsky issued an order permitting Plaintiff to depose Sergeant Vincent Gough who supervised the investigation for Ms. Aronov.  However, despite significant efforts, Plaintiff was unable to secure his deposition.  Dkt. No. 139.  To the extent the Court requires further admissible evidence regarding the Aronov investigation, the City has agreed not to oppose Plaintiff's application for addition discovery on grounds of timeliness of the discovery.

fliers containing Ms. Aronov's photo.  ¶¶ 183, 189.  The NYPD also immediately delved into the Aronovs' backgrounds, poring through financial and phone records in the process, in search of any pertinent clues in their investigation. ¶ 188.

Similar to Ms. Moore, Ms. Aronov was over the age of eighteen and therefore did not automatically qualify as a "missing person" under Category A, nor did she qualify for any of the other Categories B through F.  ¶¶ 68, 173, 178.  However, the NYPD conducted an immediate search and investigation for Ms. Aronov because the unaccountable and involuntary circumstances of her disappearance dictated that she fall into Category G.  ¶¶ 173-189.  There is simply no legitimate, non-discriminatory reason why Ms. Aronov and Ms. Moore were treated so differently.

**ARGUMENT**

**I.      SUMMARY JUDGMENT STANDARD**

Summary judgment may only be granted where the parties' submissions "show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The City bears the burden of making this showing.  All facts must be viewed in the light most favorable to Plaintiff, and all ambiguities and inferences in Plaintiff's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  Here, the record shows that genuine factual disputes exist that are material to Plaintiff's claims and must be resolved at trial, thus precluding summary judgment.

**II.     PLAINTIFF CAN ESTABLISH STATE ACTION**

Plaintiff can easily establish "state action" in connection with her § 1983 claims.  The City argues that "[b]ecause the activity that caused Ms. Moore's tragic death was not 'state action,' but … the criminal conduct of two private non-state actors, the City cannot be liable for their conduct as a matter of law…"  Def. Mem. at 9.  This argument demonstrates a complete misunderstanding of the crux of Plaintiff's case.  Plaintiff does not contend that the City is liable for the criminal conduct

9

of Troy Hendrix and/or Kayson Pearson.  Rather, Plaintiff can establish state action, or inaction, in the NYPD's discriminatory failure to label Ms. Moore missing and conduct an immediate missing person search, in violation of the Equal Protection Clause.

Courts have long recognized that liability under the Equal Protection Clause can be imposed where the alleged injury resulted from the criminal conduct of a third-party non-state actor, when a claim is based on the *discriminatory refusal to provide police services*.  See, e.g., Estate of Macias v. Ihlde, 219 F.3d 1018, 1028 (9th Cir 2000) (denying summary judgment, as discriminatory denial of protective services leading to murder by non-state actor deemed sufficient "state action") Pyke v. Cuomo, 258 F.3d 107, 110 (2d Cir. 2001) (denying summary judgment where police protection allegedly refused because plaintiffs were Native American); Watson v. City of Kansas City, 857 F.2d 690, 695 (10th Cir. 1988) (denying summary judgment and finding "state action" on claim alleging discriminatory application of police protection to disadvantage of female domestic violence victims); Wright v. City of Ozark, 715 F.2d 1513, 1516 (11th Cir. 1983) ("defendants may have owed no duty … to protect [plaintiff] from a rapist, [but] did owe a duty under the equal protection clause not to discriminate in providing law enforcement services.").[5]

Plaintiff is not arguing that the conduct of Hendrix and Pearson fall within the ambit of state action.  The City's failure to label Black persons "missing" and conduct immediate investigations for Black persons, when compared to non-Black missing persons, is the state action that violated Plaintiff's Equal Protection rights.  That action (or inaction) directly caused Ms. Moore's death for the reasons described in Section V, below.  Clearly the failure to conduct non-discriminatory missing person searches is actionable state action.

---

[5]     Defendant' cases at best only support the proposition that conduct of non-state actors comes within the sphere of "state action" when the non-state actor is controlled or encouraged by the state. See e.g. Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255 (2d Cir. 2008) (action based on dispute between plaintiff and group home for mentally disabled adults regarding care of plaintiff's son); Tancredi v. Metropolitan Life Ins. Co., 316 F.3d 308 (2d Cir. 2003) (action by policyholders against insurer based on insurer's decision to reorganize).

III.   **PLAINTIFF IS NOT ALLEGING ENTITLEMENT TO "ADEQUATE POLICE INVESTIGATION"**

The City argues that failure to provide Ms. Moore with an "adequate investigation" cannot form the basis of a § 1983 claim.  Def. Mem. at 9.  This argument misses the mark.  Plaintiff's claim is not that Ms. Moore was denied adequate police protection; rather, she is claiming her Equal Protection rights were violated  based on the City's discriminatory custom or policy of denying Black missing persons equal police services as non-Black missing persons.

It is well-established that individuals have a Constitutional right to have police services administered in a nondiscriminatory manner.  See DeShaney v. Winnebago County Dep't of Soc. Serv., 489 U.S. 189, 197 n.3 (1989) (municipalities may not create policies and practices that "selectively deny [their] protective services to certain disfavored minorities without violating the Equal Protection Clause") (citing Yick Wo v. Hopkins, 118 U.S. 356 (1886)); Watson, 857 F.2d at 694  ("no general constitutional right to police protection, [but] state may not discriminate in providing such protection"); Hilton City v. Wheeling, 209 F.3d 1005, 1007 (7th Cir. 2000) ("[S]elective withdrawal of police protection … is the prototypical denial of equal protection.") (citations omitted); Elliot-Park v. Manglona, 592 F.3d 1003, 1007 (9th Cir. 2010) (allegation that plaintiff would have received more police services had he been of a different race sufficient to support Equal Protection Clause claim); Neighborhood Action Coalition v. City of Canton, Ohio, 882 F.2d 1012 (6th Cir. 1989) (Equal Protection claim stated based on police's failure to respond to calls from racial minority neighborhood, causing it to become unsafe and property value to lessen). [6]

Ms. Carmichael's claim is not that there is a Constitutional right to have a missing persons search initiated; rather, she claims that the City discriminates against Black missing persons with

---

[6]    The City relies on Harrington v. County of Suffolk, 607 F.3d 31 (2d Cir. 2010), which, unlike the instant action, did not involve any alleged discriminatory conduct, but a mere failure to investigate.  The court found only that there is no Constitutional right to an investigation.  However, no court has held that a discriminatory failure to investigate is Constitutionally permissible.

regard to missing person searches by failing to label missing Black persons "missing," and therefore fail to conduct immediate investigations for Black missing persons.  Accordingly, the City's summary judgment motion in this regard should be denied.

**IV.    PLAINTIFF CAN ESTABLISH EQUAL PROTECTION CLAIMS**

    **A.    Overview of Equal Protection Claims under Section 1983**

The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race.  Washington v. Davis, 426 U.S. 229, 239 (1976).  To establish a violation of the Equal Protection Clause under § 1983, a plaintiff must show that she was treated differently from similarly situated persons because of her membership in a protected class of individuals, and that the disparate treatment was intentional or purposeful.  See Schroeder v. Hamilton Sch. Dist., 282 F.3d 946, 950–51 (7th Cir. 2002) (citations omitted).  A court may infer discriminatory purpose from the totality of the circumstances.  Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977).

Municipal liability for an Equal Protection violation under § 1983 is analyzed by standards elucidated in Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978).  A government entity is liable under § 1983 when it has adopted a policy or custom that results in the deprivation of a plaintiff's constitutional rights.  See id. at 694.  The existence of a custom or policy can be proved through a "sufficiently persistent or widespread" practice that is so permanent and well-settled so as to constitute custom or usage with the force of law.  Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007).  Even absent an official written discriminatory policy, where the conduct of a municipality's employees demonstrates the effective existence of an unwritten policy, municipal liability may arise.  See Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004) ("sufficient to show … discriminatory practice of subordinate employees [] so manifest as to imply the constructive acquiescence of senior policy-making officials" to support § 1983 claim).

While a Plaintiff in a § 1983 Equal Protection claim must show discriminatory intent, direct evidence of discrimination – a "smoking gun" – is rarely available.  See McKee v. Rockwall, Tex., 877 F.2d 409, 421 (5th Cir. 1989) (J. Goldberg, dissenting) ("it is clear that the Supreme Court does not require a nonmovant to produce a smoking gun to advance past the summary judgment stage").  A victim of discrimination is thus seldom able to prove his or her claim by direct evidence, and is usually constrained to rely on the cumulative weight of circumstantial evidence, since "rarely can it be said that a legislature or administrative body … made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one."  United States v. City of Yonkers, 96 F.3d 600, 611-12 (2d Cir. 1996).  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Village of Arlington, 429 U.S. at 266.

Courts within this Circuit have held that a plaintiff can rely heavily on statistical data to establish an equal protection Monell claim.  See Floyd v. City of New York, 813 F. Supp.2d 417, 449-53 (S.D.N.Y. 2011) (denying summary judgment on Equal Protection claims that relied, in part, on statistical evidence of racial disparities in police stops); Ligon v. City of New York, 12 CIV 2274 (SAS), 2013 WL 628534 (S.D.N.Y. Feb. 14, 2013) (holding statistical analysis, in part, sufficient to demonstrate likelihood of plaintiff's ability to prove widespread practice); Watson, 857 F.2d at 695 (denying summary judgment on Equal Protection claim based on, in part, statistical evidence suggesting existence of discriminatory policies/customs against women);  M.O.C.H.A. Society, Inc. v. City of Buffalo, 98-CV-99 (JTC), 2007 WL 3354211, at * 6 (W.D.N.Y. Nov. 9, 2007) (denying summary judgment and finding "statistical proof," in part, sufficient to support claim that "City engaged in a policy, custom or practice of discrimination"); Hardy v. Greenwich, 06-CV-833(MRK), 2008 WL 5117370, at * 5 (D.Conn. Dec. 3, 2008) (denying summary judgment,

finding statistical data can "raise the specter of racial discrimination in the [Police] Department and constructive acquiescence on the part of the [municipality]").

> **B.**     **Plaintiff Can Establish Discriminatory Intent**

Plaintiff can establish discriminatory intent behind the City's failure to label Black individuals as "missing" and conduct immediate investigations for Black missing persons. This discrimination manifests itself in a widespread, racially discriminatory practice of failing to conduct immediate searches for Black missing persons in the same manner as non-Black missing persons. The City's refusal to label Ms. Moore "missing" and commence an immediate investigation is emblematic of a pervasive pattern of discrimination in the NYPD. Ms. Moore is a tragic victim of the City's discriminatory practices.

> **1.    Evidence of Widespread Discrimination Through Statistical Analysis**

During discovery, the City produced a database of information regarding individuals labeled as "missing persons" by the NYPD from January 2000 through May 2003. This database contained information, including, but not limited to gender, age, race and Patrol Guide category concerning each person the NYPD categorized as a "missing person" during this time frame. It was in this time frame that Ms. Moore's missing person report was filed.

An expert statistical analysis of this data, conducted by Dr. Mark Killingsworth, demonstrates that during this time period, the City of New York had a *significant* underrepresentation of Black missing persons (at ages 18+ and/or 21+) relative to what would be expected using both national and local benchmarks. Ex. RR, at Tables 3-7. Dr. Killingsworth's report shows that there is a significant shortfall of Black individuals labeled as "missing" on a citywide basis. Based on national benchmarks, during this period, the City had approximately 162 fewer Black missing persons aged 21+ than would be expected. Id. at Table 3. Based on national benchmarks, the underrepresentation of Black missing persons was statistically significant at

conventional statistical levels, as the roughly 162 person discrepancy of Black missing persons constitutes approximately 3.9309 "standard errors," which means such discrepancy would only occur by chance less than 1 time out of 10,000 (or, less than .01%). <u>Id</u>.  By convention, a disparity of 5% or less is said to be "statistically significant."  <u>Id</u>. at ¶4, n.4.  Thus, this disparity, when applying national benchmarks, is highly statistically significant and indicative of discrimination.

Dr. Killingsworth further found that the missing persons data demonstrates an even more dramatic shortfall in the expected number of Black "missing persons" when New York City benchmarks are used.  When Manhattan is used as a benchmark rather than the United States, there is a 564 person discrepancy of Blacks 18+ labeled as "missing" across the remaining four boroughs; a disparity statistically significant at conventional statistical levels, constituting 14.6 "standard errors," meaning such discrepancy would occur by mere chance less than 1 time out of 10,000 (or, less than a .01%).  <u>Id</u>. at Table 6.  Similarly, when Staten Island is used as a benchmark, there is a 599 person discrepancy of Black missing persons 18+ across the remaining boroughs; a discrepancy statistically significant at conventional statistical levels, constituting 14.1 "standard errors," meaning having less than a .01% likelihood of occurring by chance.  <u>Id</u>. at Table 7.[7]  Thus, under either a national of local benchmark line of analysis, the stark underrepresentation of Blacks amongst missing persons in New York City is abundantly apparent, and is extremely unlikely to have been caused by mere chance.

Courts in this Circuit place great weight on standard-deviation/standard-error analysis.  At the *prima facie* stage, a plaintiff can rely on such evidence to carry her burden of demonstrating that a disparity is attributable to a challenged municipal practice.  <u>United States v. City of New York</u>, 683 F.Supp.2d 225, 236, n.5 (E.D.N.Y. 2010) (granting plaintiffs' motion for summary judgment of

---

[7]     Contrary to the City's self-serving assertions, Dr. Killingsworth does not conclude that Blacks are "slightly" underrepresented in the raw data of the missing person database.  The City also claims that "the statistical variation appears to be small" which demonstrates nothing other than the unremarkable fact that the City's attorney does not understand statistics.  Def. Mem. at 15-16.

Equal Protection claims after finding that statistical evidence of disparate impact alone was sufficient to establish *prima facie* discriminatory intent).  The Second Circuit has recognized that standard errors of more than two units can give rise to a *prima facie* case of discrimination because of the low likelihood that such disparities have resulted from chance.  See Malave v. Potter, 320 F.3d 321, 327 (2d Cir. 2003) ("[a statistical significance of two standard errors or more is] sufficient to warrant an inference of discrimination.") (quotation omitted); Waisome v. Port Auth. of New York & New Jersey, 948 F.2d 1370, 1376 (2d Cir. 1991)  ("finding of two or three standard deviations …[is] highly probative of discriminatory treatment"); Guardians Assoc. of New York City Police Dep't, Inc. v. Civil Serv. Comm., 630 F.2d 79, 86 (2d Cir. 1980) ("[I]n cases involving large samples, 'if the difference between the expected value … and the observed number is greater than two or three standard deviations,' a prima facie case is established.") (citation omitted).[8]

Here, as stated above, Dr. Killingsworth has determined that there are dramatic statistical disparities in the percentages of Blacks over the ages of 18 and 21 who are reported missing in New York City at standard errors of: (a) 3.99 standard errors for adults 21+ using a national benchmark (Ex. RR, at Table 3); (b) 14.6 standard errorss for adults 18+ using Manhattan as a benchmark (id. at Table 6) and (c) 14.1 standard errors for adults 18+ using Staten Island as a benchmark.  Id. at Table 7.  Such gross statistically significant disparities, which cannot merely be explained away by

---

[8]     The City's reliance on Reynolds v. Barrett, 685 F.3d 193 (2d Cir. 2012) is misplaced. There, a district court's decision to deny a motion to *amend a complaint to add class claims* under the Equal Protection Clause against individual state actors accused of discrimination was upheld. 685 F.3d at 197.  Plaintiffs argued that they could establish questions of law or fact common to the proposed class based on statistical evidence.  Reynolds, 685 F.3d 198-200.  Here, Plaintiff is not seeking to assert § 1983 claims on behalf of a class, nor does Plaintiff seek to hold any individual state actor liable.  For these reasons alone, Reynolds has little bearing on the instant action.  As to the City's assertion that Plaintiff cannot rely on a "disparate impact" theory to establish a § 1983 claim, Reynolds held that the question of whether a plaintiff could rely on disparate impact evidence to establish discriminatory intent under Monell remains an open question.  See Reynolds, 685 F.3d at 201, n.7 (discussing cases from sister circuits which "appear to assume the [pattern-or-practice disparate impact] framework may be employed to establish intentional discrimination under § 1983… to hold an entity liable.") (citations omitted).  As such, Reynolds does not foreclose Plaintiff's ability to use statistics, along with other evidence, to demonstrate discriminatory intent.

chance, are highly probative of the existence of a widespread policy or custom, and is more than sufficient at this summary judgment to withstand the City's motion.

The City's attack of the Killingsworth Report's purported lack of controls for variables is without merit.  The principles of "<u>Daubert</u> reinforce[] the idea that there should be a presumption of admissibility of evidence."  <u>Borawick v. Shay</u>, 68 F.3d 597, 610 (2d Cir.1995); <u>see also</u> <u>Cohalan v. Genie Industries, Inc.</u>, 10 Civ. 2415(JMF), 2013 WL 829150, at *5 (S.D.N.Y. Mar. 1, 2013) ("since <u>Daubert</u>, 'the rejection of expert testimony is the exception rather than the rule'") (internal citations omitted).  Questions as to the reliability of statistical methodology used by experts "go to weight rather than admissibility," (<u>Joseph S. v. Hogan</u>, 06-cv-1042 (BMC)(SMG), 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011)), and a purported failure to account for every variable will affect only the weight and not the admissibility of the statistics.  <u>See</u>, <u>e.g.</u>, <u>Bazemore v. Friday</u>, 478 U.S. 385, 400 (1986); <u>Watson</u>, 857 F.2d at 695 (10th Cir. 1988) (failure to statistically account for unquantifiable variables does not undermine the probative value of statistics); <u>Allen v. City of New York</u>, 466 F.Supp.2d 545, 550, n.3 (S.D.N.Y. 2006) (denying motion <i>in limine</i> to exclude statistical expert's report because "at trial plaintiffs could use evidence from other sources" to demonstrate insufficiency of "potentially explanatory variables" to account for statistical disparity at issue),

Nonetheless, Dr. Killingsworth's Report does sufficiently control for potentially explanatory variables, notably by controlling for: (1) age (by looking at both the 18+ and 21+ adult populations, which is significant since the national crime and census statistics used as benchmarks distinguish adults into these two age categories); and (2) geographic location (by using various geographic benchmarks, including the entire United States, Manhattan and Staten Island).  Ex. RR, at Tables 3-7.  Using these controls, Dr. Killingsworth found that the aggregate shortfall of Blacks among missing persons is substantial and statistically significant compared to every benchmark used, particularly in the City's boroughs that have the highest Black populations and contribute the most

17

missing persons reported - Brooklyn, Bronx and Queens. Id.[9] Accordingly, the Killingsworth

Report provides important statistical context to the events underlying this suit; any alleged absence

of explanatory variables is a question of weight best left for trial.[10]

### 2. Disparate Treatment of Ms. Moore and Ms. Aronov

Dr. Killingsworth's conclusion that Black missing persons are statistically significantly

underrepresented among missing persons in New York City is entirely consistent with and explains

the NYPD's conduct in response to Ms. Carmichael's report of Ms. Moore's disappearance.

Indeed, the NYPD's response to the missing person report regarding Ms. Moore (and by

comparison, the NYPD's response to the missing person report regarding Svetlana Aronov) is

emblematic of the disparate missing person practices conducted by the NYPD.

As stated above (*infra* at 3-4), based on her circumstances, Ms. Moore was clearly a

"missing person" by Patrol Guide standards under Category G (and Special Categories E and F) as

her disappearance was clearly "unaccountable or involuntary" and "unique/unusual".  Ms. Moore:

(a) told her mother that she was going to a restaurant on her block and would return home that

night, but never did, (¶¶ 79, 88); (b) told Mr. Williams that she was heading home and would call

him when she got there, but never did, (¶¶ 81, 83); (c) was a responsible, diligent student and

---

[9]     The City's reliance on Ackerman v. Oryx Communications, Inc., 810 F.2d 336 (2d. Cir. 1987) is also amiss.  There, the reliability of statistical methodologies without control variables was queried in the context of an appeal of a final judgment rendered under § 11(a) of the 1933 Act.  Id. at 343.  As such, the standard applied there is wholly inapplicable.  Moreover, the City's reference to Boucher v. Suzuki Motor Corp. omits a more telling quotation; that excludable expert testimony must be "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" 73 F.3d 18, 21 (2d. Cir. 1996).

[10]     Moreover, the City's claim that the Killingsworth Report is "irrelevant" because it fails to explain whether there is a longer time lag between the start of investigations for Black missing persons misses the crux of Plaintiff's claim.  Plaintiff is not contending that Blacks who are labeled as "missing" persons are investigated by the NYPD less promptly than non-Blacks.  Plaintiff claims that the refusal to label Black missing persons – such as Ms. Moore – as "missing" leads to a failure to *immediately investigate* (or in some circumstances, never investigate) those reports.  The Killingsworth Report speaks directly to that point.

employee who had never been in trouble before, (¶¶ 92 -94, 104-106), (d) had never gone out and not returned home before, (¶¶ 88, 92, 95); (e) left behind her identification, wallet, bank card and passport, (¶¶ 100, 103); and (f) was never seen at her intended destination of Burger King on the night of her disappearance. ¶ 87.  Ms. Moore's disappearance was highly unusual, yet the NYPD refused to categorize Ms. Moore as a "missing person," which resulted in the lack of any immediate search for her.  It was only after the 67th Precinct was pressured by local politicians that any search was conducted, more than three days later.  ¶¶ 138-142.  Of course, by then, it was too late.

In contrast, as described above (*supra* at 8-9) the missing person report for Ms. Aronov, a White woman on the Upper East side married to a doctor, handled only a month before Ms. Moore's, generated an entirely different response. The circumstances surrounding the disappearance of Ms. Aronov were remarkably similar to Ms. Moore's, with the only real difference being their race.[11] Yet, the NYPD's responses to the two missing person cases could not be more disparate.[12]

Neither Ms. Moore nor Ms. Aronov appeared to have voluntarily disappeared or run away. ¶¶ 88, 100, 103, 176.  Both women left their homes with the clear intention of returning back soon (Ms. Moore intended to go to the Burger King on her block; Ms. Aronov left to walk her dog and had made plans for later that afternoon), leaving behind concerned families. ¶¶ 79, 89, 98, 173-175. Both women also left behind tangible evidence of their intention to return home, including wallets, identification, bank cards, and money.  ¶¶ 100, 103, 174.  Both women were emancipated adults above the age of 18.  Clearly, by any reasonable standard, Ms. Moore and Ms. Aronov were

---

[11]      Indeed, when a former NYPD Missing Persons Squad detective was asked why there was disproportionately more attention paid to Ms. Aronov's case than to Ms. Moore's by the NYPD, the detective tellingly said, "It's happening because number one it's Manhattan, [] she's got money, [] her husband's a doctor, and she's white."  Ex. PP.

[12]      Even after a search commenced for Ms. Moore, the NYPD detectives were entirely disrespectful towards Ms. Carmichael, asking her questions such as "was your daughter pregnant?" and saying ""What do you want me to do? Do you want me to pull [Romona] out of a hat?" ¶¶ 159, 169.  Comments of this derisive nature were never made in connection with Ms. Aronov.

similarly situated missing adults who both disappeared under highly unusual circumstances, requiring an immediate search and investigation by the NYPD into their whereabouts.[13]   Yet, the NYPD immediately labeled Ms. Aronov as a "Category G" missing person, initiating a massive search and investigation which utilized substantial resources,  (¶¶ 173-189) while, in contrast, Ms. Carmichael spent days begging and pleading for the NYPD to just look into her daughter's case, yet no action was taken for several days.  ¶¶ 109-111, 113, 133, 142-144, 146, 147.  Ms. Aronov and Ms. Moore were treated entirely differently by the NYPD under virtually identical circumstances, with the only difference being their races.

The NYPD's relentless refusal to label Ms. Moore "missing" and look for her, when compared to its immediate and massive response to Ms. Aronov's disappearance, together with the statistical data showing the underrepresentation of Blacks as "missing persons," permits a reasonable jury to find that the City had a policy or custom of discriminatorily withholding police services in response to reports of missing Black persons.  See Watson, 857 F.2d at 696 (plaintiff's own account of police's failure to take action against husband, plus statistical evidence showing higher arrest rate for nondomestic assault cases than domestic assaults, sufficient to allow discriminatory failure to provide police protection claim to go to trial); The Comm. Concerning Cmty. Improvement v. City of Modesto, 583 F.3d 690, 703 (9th Cir. 2009) (inference of discriminatory intent established based largely on evidence consisting of anecdotal and statistical evidence); Smith v. Gilpin County, Colo., 949 F. Supp. 1498, 1510 (D. Colo. 1996) (evidence plaintiff was treated differently than whites under similar circumstances sufficient to make claim for racially discriminatory denial of services).  The actions by the NYPD go hand-in-hand with Dr.

---

[13]     The City's assertion that Ms. Moore had a "boyfriend" (Def. Mem. at 14) is unsupported by any evidence.  See ¶ 4.  Moreover, the City's thinly-veiled attempt to portray Ms. Moore as being flighty, referring to her as a "21-year old college student" who merely "went out on a Thursday night and did not come home," is completely belied by evidence that Ms. Moore was an extremely responsible young woman whose sudden disappearance was completely out of her character.

Killingsworth's findings, and support an inference that the City indeed employs a policy or custom whereby "missing person" reports concerning Black missing persons are far less likely to result in a "missing person" designation, and therefore far less likely to result in an immediate investigation.

## V.   PLAINTIFF CAN ESTABLISH CAUSATION[14]

### A.   Relevant Standard

In order to establish *liability* for an Equal Protection violation under § 1983, a plaintiff must establish a causal relationship between the municipality's conduct and the complained of injury. A plaintiff has to show that the Constitutional violation "for which he "[seeks] compensation would not have occurred had proper procedure been observed." Miner v. City of Glen Falls, 999 F.2d 655, 660 (2d Cir. 1993) (citation omitted). Whether a plaintiff can establish causation is generally a jury question unless, in a particular case, the question is "so free from doubt as to justify taking it from the jury." Trudeau v. Wyrick, 713 F.2d 1360, 1366-67 (8th Cir. 1983). "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990). Here, there is far more than sufficient evidence to establish issues of fact as to whether Ms. Moore's death could have been avoided but for the City's discriminatory conduct.

### B.   Plaintiff Can Establish Material Issues of Fact As to Whether a Door-to-Door Canvas Would Have Located Ms. Moore

Plaintiff can establish a high likelihood – let alone a material issue for a jury – that Ms. Moore would have been located, and her life saved, if the City had conducted an immediate

---

[14]   Plaintiff may prevail on her § 1983 claim without demonstrating that the deprivation of Ms. Moore's constitutional rights *caused* any actual physical harm. See George v. City of Long Beach, 973 F.2d 706, 708 (9th Cir.1992). Even in the absence of causation leading to physical harm, a plaintiff who proves that a Constitutional deprivation has occurred is still entitled to nominal damages. Miner, 999 F.2d at 660. Thus, Plaintiff may prevail so long as she can prove that the City violated Ms. Moore's right to Equal Protection. The issue of whether Plaintiff can prove causation as to her death – which she can – is only an issue of damages.

investigation regarding her disappearance, which would have certainly included, at a bare minimum, a standard door-to-door canvas of the route she was last known to walk.

At the time Ms. Carmichael filed her missing person report with the NYPD, and for approximately two-and-a-half days thereafter, Ms. Moore was alive and being held at the home of Troy Hendrix on 5807 Snyder Avenue, only a block from where she was last seen (at Mr. Williams' residence), and on a direct route from where she was known to be going (Burger King).  ¶¶ 85, 89, 153.  We know that Ms. Moore was alive until the night of April 27, 2003 or early morning of April 28, 2003 because Hendrix and Pearson similarly held captive and raped another woman, a female minor, on April 28, 2003.  ¶¶ 154 – 156. That day, the two told the female minor that they had "killed a girl the night before," meaning either the night of April 27, 2003 or the early morning of April 28, 2003.  ¶ 155.  Moreover, the female minor was asked by Pearson that day whether he smelled like a dead body (¶ 156), which reasonably suggests that Ms. Moore had only recently been murdered.  Accordingly, even a conservative estimate of the amount of time between when Ms. Carmichael informed the NYPD about Ms. Moore's disappearance (9:00 a.m. on Friday, April 25, 2003) to the time Ms. Moore was murdered, (*i.e.* assuming that she was murdered on the night of Sunday, April 27, 2003 and not later), would mean that the NYPD had no less than 60 hours to launch an investigation into Ms. Moore's disappearance and save her life.  Had Ms. Moore been properly labeled "missing" (like Ms. Aronov) following Ms. Carmichael's initial report, an immediate search would have been conducted.  Clearly, one of the very first steps taken in such an investigation would have been a door-to-door canvass of her last known route, as the Patrol Guide explicitly states that an area canvas of an individual's "travel route" should be conducted in connection with an immediate investigation.  ¶¶ 70 – 72. Indeed, in the immediate search for Ms. Aronov, a door-to-door canvas was conducted within hours of the initial report. ¶¶ 182, 183, 186.

22

When the NYPD finally launched an investigation into Ms. Moore's disappearance late in the afternoon of April 28, 2003, it conducted a door-to-door foot canvass of the very route from Mr. Williams' home to the Burger King, which included 5807 Snyder Avenue where Ms. Moore had been held captive.  ¶¶ 160, 162, 163.  Had the NYPD labeled Ms. Moore "missing" and conducted an immediate investigation, the NYPD would have conducted a canvass promptly thereafter, and Ms. Moore would have been found while she was still alive.[15]  At a bare minimum, this creates an issue of fact as to whether an immediate search could have located Ms. Moore best left for a jury.

    **C.**    **Plaintiff Can Establish Material Issues of Fact As to Whether a Bloodhound Search Would Have Located Ms. Moore**

Plaintiff can also establish issues of fact as to whether a bloodhound search conducted in connection with an immediate investigation would have led the NYPD to where Ms. Moore was being held while she was still alive.  Had the NYPD labeled Ms. Moore "missing" and conducted an immediate investigation for her, the NYPD would have utilized a bloodhound to assist in the search.  Based on scientific evidence regarding the reliability of bloodhounds in criminal and missing persons investigations, and given the fact that Ms. Moore was being held captive only a block and in a straight line from the place she was last seen (Mr. Williams' residence), a bloodhound would have almost certainly been able to locate Ms. Moore while she was still alive.

Plaintiff can show that a bloodhound search would have been utilized in an immediate investigation.  First, the Patrol Guide provides for the use of the Canine Unit in connection with an immediate investigation.  ¶ 73.  Second, for Ms. Aronov, upon the commencement of an immediate investigation, a bloodhound was brought to her last known location within a matter of 4 hours. ¶ 181.  Moreover, when a belated search for Ms. Moore was conducted, a bloodhound was brought to

---

[15]    The NYPD's own officer training manuals prominently notes the direct relationship between the swiftness of a missing person investigation and the likelihood that the person will be found and returned home safe.  ¶ 74.  Indeed, retired NYPD detective James Samburski, who was intimately involved in the search for Svetlana Aronov, has testified under oath that "the most crucial part of any [missing person] investigation is the first 48 hours." ¶ 75.

the scene where Ms. Moore was last known within approximately the first 50 hours.  ¶ 164.

However, given that no immediate investigation was conducted for Ms. Moore, no bloodhound

search was conducted until after she had already been murdered.

Dr. Lisa Harvey, who holds a Ph.D in Physiology, Masters degrees in Forensic Science and

Physiology, has been assisting law enforcement utilize bloodhounds for over fifteen years, and has

conducted the only published scientific study on the scent abilities of bloodhounds.[16] Ex. WW,

Harvey Tr. at 50-51, 68; Ex. VV.  Dr. Harvey used her extensive scientific knowledge, background

and experience handling bloodhounds to render an expert opinion in this matter.  Based on the facts

and circumstances of Ms. Moore's disappearance, Dr. Harvey was able to conclude that a well-

trained bloodhound brought to the scene promptly, with an uncontaminated scent article, likely

would have located Ms. Moore.  Ex. TT, at 8-10.  Specifically, in forming this opinion, Dr. Harvey

considered the close proximity in which Ms. Moore was being held captive from where she was last

seen (*i.e.*, approximately one block away).  Id.  Dr. Harvey concluded that, because Ms. Moore was

being held "very close and a straight path from where she was last seen," a bloodhound "would

have an extremely good chance of finding" Ms. Moore, and, particularly if the animal was placed

"at the point [Ms. Moore] was last seen," the scent "would have led to where Ms. Moore was being

held captive."  Id. at 10.[17]   However, no bloodhound search was conducted until after Ms. Moore

---

[16]     The City derisively refers to Dr. Harvey as a "hobbyist," though she has a B.S. in Biology
and Chemistry, teaches courses in, *inter alia*, human physiology, human anatomy, gross anatomy
and endocrinology, has first-authored five scholarly, peer reviewed scientific journal articles, has
presented her research at conferences across the country, and has personally trained five
bloodhounds.  (Ex.WW, Harvey Tr. at 7-8, 18-23, 50-54; Ex. UU).  Dr. Harvey is the only person
to have conducted and published a scientific study on the topic.  Ex WW, Harvey Tr. at 48-50; Ex.
VV.  In contrast, and ironically, the City's purported bloodhound expert, Vincent Pagano, lacks any
scientific background or degree, has never conducted or participated in any scientific studies, and
has never written any scholarly articles.  (Ex. XX).

[17]     The City's challenges to the admissibility of Dr. Harvey's expert opinion are without merit.
Fed. R. Civ. P. 702 employs "a liberal standard of admissibility." Cohalan, 2013 WL 829150, at *2
(internal citations omitted).  Expert opinions may be admitted when the: (a) expert's scientific,

had been murdered.  As such, there are genuine issues of fact as to whether Mr. Ms. Moore could have been located while she was still alive had the NYPD conducted an immediate investigation.

## VI.    PLAINTIFF CAN ESTABLISH A SECTION 1981 CLAIM

Section 1981 provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to ... the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment."  42 U.S.C. § 1981(a).  Unlike claims brought under § 1983, a § 1981 violation "is not based on an underlying violation of a constitutional right, but rather provides an alternative statutory remedy for violations that concern an activity enumerated in the statute."  Olivera v. Town of Woodbury, 281 F.Supp.2d 674, 684 (S.D.N.Y. 2003).  To establish a §1981 claim, plaintiffs "must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities."  Anderson v. City of New York, 817 F. Supp. 2d 77, 95 (E.D.N.Y. 2011).  In assessing evidence of discriminatory intent, courts are instructed to use an "expansive approach to the record" because plaintiffs in such suits must often "rely on the cumulative weight of circumstantial evidence, and a defendant is unlikely to leave a smoking gun."  Id.  (citation omitted).

---

technical or other specialized knowledge will aid the jury determine a fact in issue; (b) the testimony is based on sufficient facts and data; and (c) is the product of reliable principles and methods applied to the facts of the case.  Fed. R. Civ. P. 702.  Dr. Harvey is a preeminent expert on the reliability of bloodhounds, having published peer reviewed scientific studies on this subject.  Ex. WW, Harvey Tr. at 11-13.  Dr. Harvey also has technical expertise in this area with experience in utilizing bloodhounds for over 15 years, in addition to training several bloodhounds herself.  Id. at 68; Ex. UU.  Further, her opinion is unquestionably based on sufficient facts and data, as she formed her opinion after, inter alia, visiting the relevant locations, reviewing NYPD records and reviewing the deposition transcript of the NYPD's bloodhound handler, together with her own personal knowledge on the issue of bloodhound reliability in criminal investigations.  Ex. TT, at 8-10; Ex. WW, Harvey Tr. at 80-81, 96-99.  Lastly, Dr. Harvey applied scientific principles to the facts at hand before coming to a well-reasoned opinion concerning the likelihood that a prompt use of a bloodhound would have led the NYPD to Ms. Moore while she was still alive.  Ex.TT, at 10.

Here, Plaintiff can establish the City's intent to discriminate on the basis of race based on the reasons articulated above.  Plaintiff can also establish that the City's discrimination concerned one of § 1981's enumerated activities, namely receiving the full and equal benefit of all laws as enjoyed by white citizens.  Accordingly, Defendants' motion for summary judgment of Plaintiff's § 1981 claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied.

Dated: April 29, 2013
     New York, New York          Respectfully submitted,

**THOMPSON WIGDOR LLP**

By: _____ /s/ _____
        Kenneth P. Thompson
        Douglas H. Wigdor
        David E. Gottlieb
        Tanvir H. Rahman

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845
kthompson@thompsonwigdor.com
dwigdor@thompsonwigdor.com
dgottlieb@thompsonwigdor.com
trahman@thompsonwigdor.com

*Counsel for Plaintiff*

26