**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X

ELLE CARMICHAEL, as the Administratix of the                    :
Estate of Romona Moore,                                         :
                                                                :    No. 06 Civ. 1913 (NG)(VVP)
                                              Plaintiff,         :
                                                                :
                          v.                                    :
                                                                :
CITY OF NEW YORK, et al.,                                       :
                                                                :
                                              Defendants.       :
                                                                :
                                                                :
------------------------------------------------------------- X

## PLAINTIFF'S RULE 56.1 COUNTERSTATEMENT

Pursuant to Local Civil Rule 56.1 (b) and in response to Defendant's Rule 56.1 Statement of Facts annexed to the Motion for Summary Judgment by Defendant City of New York ("Defendant" or the "City"), Plaintiff Elle Carmichael ("Plaintiff" or "Ms. Carmichael"), by and through undersigned counsel, Thompson Wigdor LLP, respectfully submits the following statement of material facts in dispute, which demonstrates that there are genuine issues of material facts to be tried:[1]

1.      Admit for purposes of this motion.

2.      Admit for purposes of this motion.

3.      Admit for purposes of this motion.

---

[1]      All statements of fact not controverted herein are "admitted" solely for purposes of this Rule 56.1 Counter-Statement in opposition to Defendants' motion for summary judgment.

4.      Dispute that Gary Williams was Romona Moore's "boyfriend," as the deposition testimony merely states that Mr. Williams was a friend of Ms. Moore. Ex. B,[2] Carmichael Tr. at 12: 12-15; 49: 22-25.  Dispute the remainder of this paragraph as unsupported by the cited testimony.

5.      Admit for purposes of this motion.

6.      Admit for purposes of this motion.

7.      Admit for purposes of this motion.

8.      Admit for purposes of this motion.

9.      Admit for purposes of this motion.

10.     Dispute that Plaintiff told the 911 operator that her daughter had left the "night" before, as deposition testimony cited states that she told the operator that her daughter had left the "day" before.  Ex. B, Carmichael Tr. at 15: 16-22.  Admit remainder of this statement of fact for purposes of this motion.

11.     Admit for purposes of this motion.

12.     Admit for purposes of this motion.

13.     Dispute that the paragraph accurately reflects the totality of the conversation between Officer Richardson and Ms. Moore, but admit the remainder for purposes of this motion.

14.     Dispute that the paragraph accurately reflects the totality of the conversation between Officer Richardson and Ms. Moore and dispute that Ms. Carmichael told Officer Richardson that Ms. Moore had gone to register merely "for her classes," as deposition testimony states that Ms. Carmichael told Officer Richardson that Ms. Moore had gone to register

_____

[2]      "Ex. _" will hereinafter refer to the corresponding Exhibit referenced in the Thompson Declaration, unless specified otherwise.

specifically "for summer classes." Ex. B, Carmichael Tr. at 17: 23-25; 18: 1-7.  Admit remainder of this statement of fact for purposes of this motion.

15.     Dispute the use of the word "Finally" as unsupported by the cited testimony and dispute that Ms. Carmichael told Officer Richardson that Gary Williams said Romona was there the "night" before, as the deposition testimony cited states that Mr. Williams said Romona was at Williams' house the "evening" before.  Ex. B, Carmichael Tr. at 18: 1-7.  Admit remainder of this statement of fact for purposes of this motion.

16.     Admit for purposes of this motion.

17.     Dispute that Ms. Carmichael provided Officer Richardson with only the information cited in ¶¶ 14-16 of the City's 56.1 Statement, as Ms. Carmichael also told Officer Richardson that Ms. Moore was a successful student at Hunter College, attended college every day, and never missed a single lecture.  Ex. B, Carmichael Tr. at 19: 19-23.  Admit remainder of this statement of fact for the purposes of this motion.

18.     Admit for purposes of this motion.

19.     Admit for purpose of this motion.

20.     Admit for purposes of this motion.

21.     Admit for purposes of this motion.

22.     Dispute that the cited document supports the proposition that Det. Henn told Ms. Carmichael that her daughter could go "anywhere she wished," as the deposition transcript cited states that Det. Henn told Ms. Carmichael that her daughter "could be anywhere with her boyfriend." Ex. B, Carmichael Tr. at 21: 23-25; 22: 1-3.  Dispute also that this was the "substance" of what Det. Henn told Ms. Carmichael, as he also said to her, "I don't know why

you are calling the precinct." Ex. B., Carmichael Tr. at 22: 1-2.  Admit remainder of this statement of fact for purposes of this motion.

23.     Admit for purposes of this motion.

24.     Admit for purposes of this motion.

25.     Admit for purposes of this motion.

26.     Admit for purposes of this motion.

27.     Admit for purposes of this motion.

28.     Admit for purposes of this motion.

29.     Admit for purposes of this motion.

30.     Admit for purposes of this motion.

31.     Dispute that the gentleman who called the 67th Precinct informed whoever he spoke to from the 67th Precinct that Ms. Carmichael was "a constituent," as the deposition testimony cited does not support that proposition.   Ex. B, Carmichael Tr. at 31: 18-25; 32: 1-10. Admit remainder of this statement of fact for purposes of this motion.

32.     Admit for purposes of this motion.

33.     Admit for purposes of this motion.

34.     Admit for purposes of this motion.

35.     Admit for purposes of this motion.

36.     Admit for purposes of this motion.

37.     Admit for purposes of this motion.

38.     Admit for purposes of this motion.

39.     Dispute.  Det. Carey sought publicity for at least one missing persons case he worked on, which was for an elderly Alzheimer's patient, by reaching out to the Alzheimer's

Association and asking them to publicize the information regarding the missing patient.  Ex. C, Carey Tr. at 212: 3-11.

40.     Dispute.  Admit for purposes of this motion of this motion that Det. Carey testified consistent with the proposition espoused, but dispute that the cited testimony establishes the proposition as a fact. Ex. C, Carey Tr. at 231.

41.     Dispute.  The stated proposition ("In [Carey'] experience, parents made statements like that for their own reasons") is not supported by the deposition testimony cited ("Sometimes parents don't want to tell you that their children are on the wild side.").  Ex. C, Carey Tr. at 231:21-22.

42.     Dispute.  Admit that in missing persons cases reported by parents regarding their missing children, Det. Carey stated that he had learned that the missing persons were runaways or had gone out with friends for the night, but dispute the accuracy of the proposition or that this was "often" the case, as the deposition testimony cited does not support the assertion. Ex. C, Carey Tr. at 231: 15-25.

43.     Dispute.  Admit for purposes of this motion that Det. Carey testified consistent with the statements in the paragraph, but dispute that the cited testimony established what Det. Carey believed.

44.     Admit for purposes of this motion.

45.     Admit for purposes of this motion.

46.     Dispute that this statement of fact states the totality of what Det. Carey learned from Mr. Williams regarding Ms. Moore, as Det. Carey also learned that Ms. Moore told Mr. Williams that she would return home after going to Burger King and would give Mr. Williams a

phone call then.   Ex. D, NYC 866.  Admit remainder of this statement of fact for purposes of this motion.

47.   Admit for purposes of this motion.

48.   Dispute that this statement of facts states the totality of the conversation Det. Carey had with the cashier from Burger King, as Det. Carey was also told that the cashier was familiar with Ms. Moore because she frequently patronized the restaurant.  Ex. C, Carey Tr. at 307.  Admit remainder of this statement of fact for purposes of this motion.

49.   Admit for purposes of this motion.

50.   Admit for purposes of this motion.

51.   Admit for purposes of this motion.

52.   Admit for purposes of this motion.

53.   Admit for purposes of this motion.

54.   Dispute.  Admit that Pearson told Det. Carey that he and Troy Hendrix had kidnapped and raped Romona Moore, but dispute that Pearson told Carey that this took place during April 24-26, 2003, as the trial testimony cited does not support this alleged time period when Ms. Moore was purportedly held.  Ex. E to Larkin Decl. at 1661-65.

55.   Dispute.  Admit that Pearson told Det. Carey that Hendrix killed Ms. Moore using a hammer and that he and Hendrix disposed of her body, but dispute that this took place in the "early morning hours (approximately 2:00 a.m.) on Sunday, April 27, 2003," as the trial testimony cited does not support that this incident took place on the date alleged.  Ex. E to Larkin Decl. at 1663-65.

56.   Admit for purposes of this motion.

57.   Admit for purposes of this motion.

58.     Admit for purposes of this motion.

59.     Dispute.  Admit that Officer Figueroa was assigned to the NYPD canine unit in 1998, but dispute that he remains assigned to the canine unit to the present, as the deposition testimony cited merely supports that Officer Figueroa remained on the canine unit to the date of his deposition, May 18, 2011.  Ex. BB, Figueroa Tr. at Coverpage; 19.

60.     Dispute.  Admit that at his deposition, May 18, 2011, Officer Figueroa recalled successfully locating one missing person, a male on Staten Island utilizing a dog named Bella, but dispute that the cited testimony supports that the recollection was accurate.  Also dispute that Bella was a "canine," as Officer Figueroa testified that Bella was a bloodhound.  Ex. BB, Figueroa Tr. at Coverpage; 60: 23-25; 61: 2.

61.     Admit for purposes of this motion.

62.     Admit for purposes of this motion.

63.     Dispute, as the deposition testimony cited does not support the statement that "at no time prior to or subsequent to April 30, 2003 did Officer Figueroa locate a missing person utilizing Kojak," andthere is nothing in the record to indicate that Officer Figueroa has not located a missing person utilizing Kojak to this day.  Ex. BB, Figueroa Tr. at 36.

64.     Admit for purposes of this motion.

65.     Admit for purposes of this motion.

66.     Admit for purposes of this motion.

## PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS IN DISPUTE

In addition to the material disputed facts enumerated and controverted above, additional material facts as to which there exists a genuine issue to be tried include the allegations below.

67.     Procedure Number 207-23 of the New York Police Department's ("NYPD") Patrol Guide, effective January 1, 2000, defines a missing person as a person missing from a New York City residence and who is (a) under eighteen (18) years of age, or (b) mentally or physically impaired such that hospitalization may be required, or (c) senile, retarded or disabled and not capable of self-care or clear communication, or (d) sixty-five (65) years of age or older, or (e) a possible victim of drowning, or (f) indicated an intention of committing suicide, or (g) absent under circumstances indicating unaccountable or involuntary disappearance.  Ex A. at NYC 806.  No specific guidelines for when and under what circumstances a missing person is labeled a "Category G" missing person are provided by the NYPD.  Id.

68.     Pursuant to Procedure Number 207-23, a "missing person" does not include a person eighteen (18) years of age or older who leaves home voluntarily because of domestic, financial or similar reasons.  Id.

69.     There are no minimum time limits that must be observed before the NYPD can accept a report of a missing person.  Id. at NYC 807.

70.     An immediate investigation and/or search by the NYPD is required when the missing persons is: (a) a child under sixteen (16) years of age, or (b) mentally/physically impaired, or (c) senile, retarded or disabled person incapable of self-care or clear communication, or (d) sixty-five (65) years of age or older, or (e) presents a unique/unusual case, or (f) missing under circumstances indicating unaccountable or involuntary disappearance, or (g) a possible drowning victim.  Id. at NYC 808.

71.     An immediate investigation into a missing person would include a door-to-door canvass of a missing's travel route beginning where the missing was last seen or known to have been.  Ex. A at NYC 809; Ex. X at 182-189; Ex. U at NYC 009017.

72.     An immediate investigation into a missing person would also include a search of the area where the missing was last seen or known to have been.  Ex. U, at NYC 009017.

73.     The NYPD also authorizes the use of Department Canine Teams, which include NYPD trained bloodhounds, to track missing persons.  Id.; Ex. A at NYC 811.

74.     There is a direct relationship between the swiftness of an investigation of a missing person and the likelihood that the missing person will be found and returned home safe, meaning that time is of the essence in investigating missing persons searches.  Ex. U at NYC 009013; Ex. X, Henn Tr. at 154-55; Ex. C, Carey Tr. at 36-37.

75.     Retired NYPD Detective James Samburski, who investigated the disappearance of Svetlana Aronov, believes that "the most crucial part of any investigation [of a missing person] is the initial 48 hours."  Ex. KK, Samburski Tr. at 72-73

76.     Moreover, once a person reported missing is deemed to be a "missing person," NYPD officers are required to make every effort to conduct a proper search to ensure that all evidence relating to the missing person is discovered and properly preserved.  Ex. U at NYC 009016.

77.     Plaintiff Elle Carmichael is a black woman.  Ex. B, Carmichael Tr. at 70: 9.

78.     Elle Carmichael's daughter, Romona Moore, was also a black woman.  Ex. B, Carmichael Tr. at 70.

79.     On April 24, 2003, at approximately 7:00 p.m., Ms. Moore told Ms. Carmichael that she was leaving home to go out to the Burger King restaurant located on the corner of Church and Remsen, less than one block from their home located at 615 Remsen Avenue in the East Flatbush section of Brooklyn, New York.  Id. at 13; Ex. AA; Ex. HH.

80.     Ms. Carmichael and Ms. Moore had not been arguing when Ms. Moore left, nor did Ms. Moore storm out of her home.  Ex. C, Carey Tr. at 296: 2-8.

81.     Ms. Moore stopped off at her friend Gary Williams' home, located at 5603 Snyder Avenue, to drop off CDs.  Id. at 305-306; Ex. D, NYC 866.

82.     5603 Snyder Avenue is approximately 500 yards away from Ms. Moore's home.  Ex. AA.

83.     Ms. Moore stayed between 10 and 15 minutes before leaving Mr. Williams' home, and informed Mr. Williams that she would go next to Burger King, and would call Mr. Williams when she arrived home thereafter.  Ex. C, Carey Tr. at 305-306; Ex. D, NYC 866.

84.     Ms. Moore never called Mr. Williams after she left.  Ex. D, NYC 866.

85.     Rather, at approximately 7:15 pm, Ms. Moore was attacked and forced from the street and into the basement of a home located at 5807 Snyder Avenue by Kayson Pearson and Troy Hendrix as she walked on Snyder Avenue from Mr. Williams' home to Burger King.  Ex. D, NYC 866; Ex. E to Larkin Decl. at 1661-1662.

86.     5807 Snyder Avenue was approximately one block/180 yards away from and on the same street as Gary Williams' home at 5603 Snyder Avenue, and approximately just three to four blocks/350 yards away from Ms. Moore's home on 615 Remsen Avenue.  Ex. AA; Ex. HH.

87.     Ms. Moore, who was a regular customer at the Burger King located on her block, was not seen by employees of Burger King that evening.  Ex. C, Carey Tr. at 307: 7-13; Ex. E, NYC 1288-90; Ex. F, NYC 870.

88.     Ms. Moore did not return home that night which caused Ms. Carmichael to become concerned.  Ex. B, Carmichael Tr. at 13: 25; 14: 1-5.

89.     At 9:00 a.m. the next morning, April 25, 2003, Ms. Carmichael placed a phone call to her local police station, the 67th Precinct, and to 911, to report that Ms. Moore had not returned home after leaving their home the previous evening and was missing.  Id. at 14-15.

90.     Police Officers Monique Richardson and Eason Sweat responded to the call and came to Ms. Carmichael's home at approximately 9:30 a.m.  Id. at 16: 2-10; Ex. F, NYC 1334.

91.     Ms. Carmichael informed Officer Richardson that her daughter Romona left their home by herself at 7:00 p.m. the previous evening to go to the Burger King located a half block away from their home, and had not yet returned.  Ex. B, Carmichael Tr. at 17-19; Ex. G, Richardson Tr. at 149-53; Ex. AA.

92.     Ms. Carmichael also told Officer Richardson that her daughter was a quiet, respectful, easy-going, responsible and delicate person, and that she really believed something was wrong.  Ex. B, Carmichael Tr. at 17-19.

93.     Ms. Carmichael also told Officer Richardson that her daughter was a successful student at Hunter College who attended class every day and had registered for summer classes the previous day.  Id. at 17-19; Ex. G, Richardson Tr. at 149-53.

94.     Ms. Moore was a 3.0 student at Hunter College, planned on finishing college, obtaining a bachelor's degree in psychology, and move on and become a pediatrician.  Ex. B, Carmichael Tr. at 10-11.

95.     Ms. Carmichael further informed Officer Richardson that it was unusual and uncharacteristic of her daughter to go out and not call or come back home for such a long period of time, and that she had never done anything like this before.  Ex. B, Carmichael Tr. at 17-19; Ex. G, Richardson Tr. at 154; 163.

96.     Ms. Carmichael also told Officer Richardson that she had contacted Ms. Moore's friends, including her friend Gary who told Ms. Carmichael that Romona visited his home the previous evening.  Ex. A, Carmichael Tr. at 17-19; Ex. G, Richardson Tr. at 155.

97.     Officer Richardson did not ask Ms. Carmichael for Gary's phone number or the phone numbers of any of Ms. Moore's friends whom Ms. Carmichael had called in search of Ms. Moore.  Ex. B, Carmichael Tr. at 18; Ex. G, Richardson Tr. at 155.

98.     Ms. Carmichael sounded and appeared visibly concerned about Ms. Moore to Officer Richardson.  Ex. G, Richardson Tr. at 149: 20-25; 150.

99.     Ms. Carmichael told Officer Richardson that she wanted to report Ms. Moore as missing.  Id. at 171.

100.    Romona Moore's wallet, social security card, bank card, identification and passport were left behind in her room.  Ex. B, Carmichael Tr. at 38-39, 42; Ex. C, Carey Tr. at 288, Ex. H, NYC 864.

101.    Ms. Moore did not leave behind any note or other indication that she had run away.  Ex. C, Carey Tr. at 298: 23-25; 299:1-4.

102.    Romona Moore's room was neat and clean, and her books were all nicely stacked.  Id. at 286:24-25; 287: 1-5.

103.    Romona Moore's phone book and/or phone numbers of friends from school were also left behind.  Id. at 310:15-25; 311: 1-4.

104.    Ms. Moore held a part-time job at the Urban Academy High School where she worked three days a week.  She had held this job for a year at the time of her disappearance.  Ex. B, Carmichael Tr. at 11: 4-12; Ex. I, C_0013.

105.     Ms. Moore had also received numerous merit awards and certificates in recognition of her scholastic achievement while she was a student at Brooklyn College Academy High School.  Ex. J, C_0020-22.

106.     Ms. Moore was also a perennial honor roll student at her middle school, William Wirt Middle School, where she received numerous recognitions for her perfect attendance record.  Ex. K, C_0024-34.

107.     As Officer Richardson met with Ms. Carmichael, NYPD Patrol Sergeant Angel Collado arrived at 615 Remsen Avenue in a police vehicle.  Ex. G, Richardson Tr. at 140-41; Ex. L, Sweat Tr. at 29:25; 30: 1-3.

108.     Sgt. Collado never exited his police vehicle during the time he was on the scene, nor did he at any point speak with Ms. Carmichael.  Ex. G, Richardson Tr. at 171; Ex. L, Sweat Tr. at 29-30.

109.     Officer Richardson informed Ms. Carmichael that the information she was taking from her would be used for informational purposes only, and not in connection with a missing persons report, because Ms. Moore was 21 years old and was free to go wherever she wanted. Ex. B, Carmichael Tr. at 18: 19-25; 19.

110.     Ms. Carmichael pleaded with Officer Richardson to open an investigation into Ms. Moore's disappearance, but Officer Richardson stated that she (Officer Richardson) could not do anything.  Id. at 19.

111.     Officer Richardson also informed Ms. Carmichael that it takes 24 hours from the time a person goes missing for the NYPD to take any action.  Id. at 20.

112.    There is no certain amount of time that needs to pass before an NYPD officer can take a missing persons report.  Ex. A, NYC 807; Ex. M, Gomez Tr. at 57; Ex. N, Cassaza Tr. at 50.

113.    Officer Richardson informed Ms. Carmichael that if she was still concerned about her daughter's disappearance, she should call the 67th Precinct back after 24 hours pass, or at 7:00 p.m. that evening.  Ex. B, Carmichael Tr. at 20.

114.    Sgt. Collado signed Officer Richardson memo book at 9:47 a.m. that morning in front of 615 Remsen Avenue.  Ex. G, Richardson Tr. at 141: 13-24.

115.    The information that Ms. Carmichael told Officer Richardson regarding Ms. Moore's disappearance and the steps Ms. Carmichael had taken since then to find her was conveyed to Sgt. Collado by Officer Richardson.  Id. at 174.

116.    Sgt. Collado did not make any statements to Officer Richardson regarding Romona Moore while on the scene, nor did he give any instructions as to what Officer Richardson was to do with the complaint regarding Ms. Moore's disappearance.  Id. at 172-73.

117.    The topic of whether Romona Moore's disappearance should be considered an "unaccountable or involuntary disappearance" was not discussed by the officers on the scene  Id. at 192: 18-22.

118.    Officer Richardson returned to the 67th Precinct station house by 9:53 a.m. that morning.  Id. at 141.

119.    Officer Richardson notified a desk sergeant, who may have been Sgt. Alvin Gomez, that she had a Missing Persons Report, but did not notify any other division of the NYPD regarding Ms. Moore's disappearance.  Id. at 180-84.

120.     When Officer Richardson returned to the 67th Precinct station house, she did not make any notification in connection with Romona Moore's missing persons report. Id. at 142-43; 182: 13-23.

121.     Officer Richardson was sent back out to patrol shortly thereafter. Id.

122.     Officer Richardson failed to record all of the information Ms. Carmichael gave her regarding Ms. Moore's disappearance in the Missing Persons Report she filled out. Id. at 225.

123.     For instance, Officer Richardson did not record that Ms. Carmichael had called Ms. Moore's friends the night before. Id.

124.     Officer Richardson also incorrectly filled out the Complaint Report, including failing to indicate that Ms. Moore's disappearance fell into the "Other" category of missing persons cases. Id. at 245-46.

125.     Officer Richardson's missing persons report did list Ms. Moore as being "Black." Ex. M, Gomez Tr. at 238: 15-19; Ex. F, NYC 1334.

126.     Officer Richardson, despite being the only officer who spoke with Ms. Carmichael on the morning of April 25, 2003 in connection with the disappearance of her daughter, Romona, was not approached by a single NYPD employee, including any supervisory officer or detective, in the three to four days after she first took the report. Ex. G, Richardson Tr. at 240.

127.     No investigation into Ms. Moore's disappearance was launched by the NYPD on April 25, 2003. Id. at 176, 205.

128.     Ms. Carmichael called the 67th Precinct at 7:00 p.m. later that day, and spoke to Detective Patrick Henn. Ex. B, Carmichael Tr. at 21-22.

129.    Detective Henn told Ms. Carmichael, "ma'am, please don't call back here.  Your daughter is 21 years of age, she could be anywhere with her boyfriend.  I don't know why you are calling the precinct. … the police officers who took your report earlier [this] morning did not follow proper procedure."  Det. Henn also told Ms. Carmichael to, "Go find your daughter wherever she is." Id.

130.    Nowhere in the complaint report Officer Richardson completed does it state that Ms. Moore had a boyfriend.  Ex. F, NYC 1334.

131.    On April 25, 2003, the Carmichael residence received two incoming phone numbers from unaccounted for phone numbers, which came from nearby neighborhood pay phones.  Ex. H, NYC 864; Ex. O, NYC 915; Ex. E, 1288-90.

132.    The next morning, April 26, 2003, Ms. Carmichael and other family members visited the 67th Precinct and spoke to a detective named Hutchinson.  Ex. B, Carmichael Tr. at 26-28.

133.    Ms. Carmichael informed Det. Hutchinson that Ms. Moore's disappearance was very unusual, that Ms. Moore was a diligent, A-1 student, was quiet and easy-going, and that it was unlike her to not return home.  Ms. Carmichael vigorously pleaded with and begged Det. Hutchinson to help her find her daughter, or to at least call Gary Williams to see if something was wrong when Ms. Moore visited there, or if Mr. Williams was somehow involved in Ms. Moore's disappearance.  Id. at 26-27.

134.    Det. Hutchinson informed Ms. Carmichael that he could not call Gary Williams because it was "not right" for him to do that.  Det. Hutchinson also told Ms. Carmichael that "[Romona] is 21 years old and there is nothing [I] can do."  Det. Hutchinson also directed Ms. Carmichael to look outside the 67th Precinct and see how many missing people posters there are.

He also said, "[M]a'am, you can check to see how many missing persons are there. Do you think we can look for everyone?" Id at 27: 17-23.

136.    Det. Hutchinson also told Ms. Carmichael that the NYPD did not have to look for her daughter because her daughter was 21 years of age. Id. at 28: 2-7.

136.    The complaint regarding Ms. Moore was marked "Closed" as of 9:30a.m on April 25, 2003, meaning that it would not be investigated by anyone from the NYPD. Ex. M, Gomez Tr. at 233-36; Ex. F, NYC 1334; Ex. P, NYC 1337-38.

137.    NYPD Sergeant Alvin Gomez, the desk sergeant listed as having "Closed" the investigation into Ms. Moore's disappearance on April 25, 2003, (Ex. M, Gomez Tr. at 185–187; Ex. F, NYC 1334, Ex. QQ, NYC 5), had not participated in a single search for a black missing person in his entire 17-year career with the NYPD. Ex. M, Gomez Tr. at 281-282.

138.    On the morning of Monday April 28, 2003, Ms. Carmichael first phoned and then visited the office of Assemblyman Nick Perry at 9:00 a.m. Ex. B, Carmichael Tr. at 29: 12-21.

139.    A young African-American male working at Assemblyman Perry's office called the 67th Precinct in Ms. Carmichael's presence to inquire into Ms. Moore's disappearance. Id. at 31-34.

140.    Also on Monday April 28, 2003, Douglas Jablon, a person with ties to Brooklyn Borough President Marty Markowitz, called the 67th Precinct to also inquire into Ms. Moore's disappearance. Id.

141.    At 2:00 p.m. that day, Ms. Moore received a call from a male officer or detective from the 67th Precinct who told her to stop bothering the Precinct by contacting officials and having them call and ask the Precinct to investigate her daughter's disappearance. Id. at 33: 25-34: 1-11.

142.    On April 28, 2003, Lt. Robert Cassaza was asked by Robert Boyce, Commanding Officer of the 67th Precinct, to look into Romona Moore's disappearance after Boyce had received a call that morning from a local politician concerning Ms. Moore's disappearance.  Ex. N, Cassaza Tr. at 78-81.

143.    At approximately 4:30 p.m. that afternoon, Lt. Cassaza assigned Detective Wayne Carey to investigate Ms. Moore's disappearance.  Ex. Q, NYC 862;  Ex. C, Carey Dep. Tr. at 275.

144.    Det. Carey was told by Lt. Cassaza that a politician had called the precinct regarding Ms. Moore's disappearance.  Ex. C, Carey Tr. at 178.

145.    During Detective Carey's time as a detective in the 67th Precinct's Detective Squad, detectives would be given missing persons reports to investigate on a daily basis. Id. at 128.

146.    Yet the first time a member of the 67th Precinct's Detective Squad was either contacted regarding Ms. Moore's disappearance, or assigned to investigate the report was on Monday, April 28, 2003 at 4:30 p.m. Id. at 160: 15-23, 172.

147.    For the first time, a case number was assigned to Ms. Moore's disappearance report on April 28, 2003.  Until that time, only a complaint number had been assigned to the report.  Id. at 241: 14-25; 242.

148.    In fact, prior to this time, despite the fact that Ms. Moore remained missing and unaccounted for, the report regarding Ms. Moore's disappearance had been marked "closed to patrol," meaning that the report would not be assigned to a detective to investigate.  Id. at 246-47.

149.     At 5:10 p.m., Det. Carey and another detective traveled to Ms. Carmichael's home on 615 Remsen Avenue to meet with her.  Ex. C, Carey Tr. at 398; Ex. H, NYC 864; Ex. R, NYC 865.

150.     Later than evening, Det. Carey interviewed Gary Williams in connection with Ms. Moore's disappearance. Ex. C, Carey Tr. at 322: 25; 323.

151.     This was the first time Mr. Williams, who was the last person to have seen Ms. Moore, had been interviewed by anyone from the NYPD in connection with Ms. Moore's disappearance.  Id.

152.     Also that evening, Det. Carey contacted several of Ms. Moore's friends from school.  This was the first time that anyone from the NYPD contacted any of Ms. Moore's friends in connection with her disappearance.  Id. at 310.

153.     Sometime in the late-morning to early afternoon of April 26, 2003, Ramando Jack, an acquaintance of Kayson Pearson and Troy Hendrix, visited the basement of 5807 Snyder Avenue where Hendrix resided, and encountered Romona Moore.  Mr. Moore was seen chained, with her hands and feet tied together, and with burns and cuts on her body, and spoke to Mr. Jack in a "teary voice."  Ex. S, Jack Trial Tr. at 434; 440: 25; 441: 1-3; 454-55.

154.     On April 28, 2003, Pearson and Hendrix tied up and repeatedly raped a female minor inside the same basement located at 5807 Snyder Avenue where Ms. Moore had been held captive.  Ex. T, Trial Tr. at 730; 739:4-25; 740-753; NYC 5315.

155.     On that day, April 28, 2003, the female minor was told by Pearson and Hendrix that the two had "killed a girl the night before."  Ex. T, Trial Tr. at 741; Ex. V, NYC 885-87.

156.     The female minor was also asked that day by Pearson if he smelled like dead body.  Ex. T, Trial Tr. at 777, Ex. V, NYC 5362.

157.   On April 29, 2003, Detective Carey investigated the suspected rape of this female

minor.  Ex. C, Carey Tr. at 413.

158.   Troy Hendrix was arrested in connection with the rape of the female minor at

approximately 11:48 p.m. on April 29, 2003.  Ex. W, NYC 883-84.

159.   On April 30, 2003, Det. Carey asked Ms. Carmichael, "was your daughter

pregnant?"  Ex. B, Carmichael Tr. at 46: 6-10.

160.   On April 30, 2003, Det. Carey ordered that the route between Gary Williams'

home and Ms. Carmichael's home be canvassed by NYPD personnel in connection with Ms.

Moore's disappearance.  Ex. C, Carey Tr. at 331-332.

161.   Mr. Williams' residence was the last known location where Romona Moore was

seen.  Ex. X, Henn Tr. at 192: 5-12.

162.   A number of NYPD detectives traveled door-to-door along the route Ms. Moore

was presumed to have last traveled, asking residents of upwards of thirty (30) addresses whether

they had seen or come into contact with Ms. Moore.  Ex. C, Carey Tr. at 331-333, 389-90;  Ex.

Y, NYC 904-05; Ex. Z, NYC 907-908, Ex. AA; Ex. HH..

163.   During this canvass, NYPD detectives knocked on and spoke to a resident of 5807

Snyder Avenue regarding Ms. Moore.  Ex. Z, NYC 907; Ex. AA;  Ex. HH.

164.   At 7:45 p.m. on April 30, 2003, NYPD Officer Jonathan Figueroa, a member of

the NYPD's Canine Unit and a trained bloodhound handler, ran three bloodhound trails with a

bloodhound named Kojak in search of Romona Moore.  Kojak was more than 4 or 5 years old

and began working with Officer Figueroa in late 2002, before which time Kojak had worked

with another NYPD officer.  Officer Figueroa was given a shirt belonging to Ms. Moore, which

he presented to Kojak.  One trail began outside the residence of Gary Williams, located at 5603

Snyder Avenue, and another trail began outside of Romona Moore's home on 615 Remsen Avenue. These trails did not yield positive results. Ex. BB, Figueroa Tr. at 36-40, 115, 119, 153, 163, 169; Ex. CC NYC 000298-000300; Ex. DD, 909; Ex. EE, NYC 008967; Ex. X, Henn Tr. at 195; Ex. C, Carey Tr. at 335.

165.     In at least one previous missing person search utilizing the services of an NYPD trained bloodhound, Officer Figueroa was able to successful find a white missing person during a search which began on the same day the person was reported missing. Ex. BB, Figueroa Tr. at 101-105.

166.     Romona Moore was being held against her will by Troy Hendrix and Kayson Pearson inside the basement of 5807 Snyder Avenue by Troy Hendrix and Kayson Pearson (Ex. JJ, NYC 1273-74), which was approximately one block/180 yards from and on the same street as where she was last seen (Gary Williams' home) at 5603 Snyder Avenue, and approximately just two to four blocks/350 yards away from her home on 615 Remsen Avenue. Ex. AA.

167.     The NYPD did not post a single poster nor distribute a single flyer in the neighborhood where Ms. Moore resided or anywhere else in the City in regards to Ms. Moore's disappearance. Ex. C, Carey Tr. at 371-73.

168.     Detective Carey, Detective Henn and Patrol Sergeant Gomez all believe that had the NYPD initiated a search for Ms. Moore during at least the first forty-eight (48) hours she went missing, her life could have been saved. Ex. C, Carey Tr. at 345; Ex. M, Gomez Tr. at 279-80; Ex. X, Henn Tr. at 214-15.

169.     On one day during the week of May 3, 2003, Ms. Carmichael called Det. Carey to inquire as to the status of the investigation into Ms. Moore's disappearance, to which Det. Carey

21

replied, "What do you want me to do? Do you want me to pull [Romona Moore] out of a hat?" Ex. B, Carmichael Tr. at 54-55.

170.     On May 10, 2003, Ms. Moore's lifeless body was found wrapped inside of a blanket lying along the side of a hotdog truck in the side yard of 6749 Kings Highway, approximately one block from 5807 Snyder Avenue (Troy Hendrix's home) where she was being held captive, and approximately one block from 5603 Snyder Avenue (Gary Williams' home) where she was last seen.  Ex. JJ, NYC 1275-76; Ex. HH.

171.     Within weeks, Kayson Pearson and Troy Hendrix were indicted for the murder of Romona Moore.  Ex. JJ, NYC 1273-74.

172.     Pearson and Hendrix were convicted in or around March, 2006 for the kidnapping, rape and murder of Romona Moore.  See Def.'s 56.1 Statement at ¶ 57 and exhibits referenced thereto.

173.     Approximately a month and half before Ms. Moore's disappearance, at approximately 11:30 p.m. on March 3, 2003, Dr. Alexander Aronov, a medical doctor, contacted the NYPD to report his wife, Svetlana Aronov, a 44-year old White woman, missing from their apartment located at 1175 York Avenue in the Upper East Side of Manhattan.  Ex. JJ, NYC 1254; Ex. KK.

174.     Ms. Aronov was last seen earlier that day at approximately 2:00 p.m. when she went out to walk a dog.  Ms. Aronov left behind her wallet, money, credit and ATM cards, and identification.  Ex. KK, Samburski Tr. at 91-92; Ex. MM, NYC 1250; Ex. MM.

175.     Ms. Aronov had planned to go to John F. Kennedy Airport later that afternoon to pick up her father, but never showed up.  Ms. Aronov had also planned to leave her house keys

22

behind with her building's doorman so that her daughter and mother-in-law could get into her apartment.  Ex. NN.

176.    Nothing in Ms Aronov's past suggested that she would not disappear voluntarily.  Ex. NN.

177.    NYPD Detective James Samburski was told by his supervisor to immediately go with his partner to the Aronovs' apartment.  Ex. KK, Samburski Tr. at 27: 6-17.

178.    By 1:00 a.m. on March 4, 2003, Ms. Aronov's disappearance had already been labeled a "Category G" missing person.  Ex. II, NYC 1254; Ex. KK, Samburski Tr. at 76-77.

179.    The NYPD considered the Aronov investigation a "big case," and the search initiated by the NYPD was "massive."  Ex. KK, Samburski Tr. at 61-62; 98.

180.    A preliminary search for Ms. Aronov was conducted within the first 2 hours by NYPD Sergeant Michael Farrone.  Ex. JJ, NYC 1250-51; Ex. II, NYC 1254-55.

181.    The NYPD also conducted a search for Ms. Aronov using the services of an NYPD trained bloodhound at 3:50 a.m. on March 4, 2003, or within four and a half (4.5) hours after Ms. Aronov's disappearance was first reported.  Ex. KK, Samburski Tr. at 39; Ex. OO, Canine Utilization Report.

182.    By 5:00 a.m. on March 4, 2003, the NYPD began questioning neighbors and residents at Ms. Aronov's apartment building.  Ex. NN.

183.    NYPD detectives also handed out fliers with her photo on York Avenue.  Id.

184.    On May 4, 2003, the NYPD held a press conference to notify the public about Ms. Aronov's disappearance.  Ex. KK, Samburski Tr. at 54-55; Ex. PP.

185. Also on March 4, 2003, the NYPD deployed a police van to the Upper East Side of Manhattan which played a recording giving information concerning Ms. Aronov's disappearance and asking for tips over a loudspeaker. Ex. MM; Ex. JJ.

186. Within 24 hours of Mr. Aronov's report regarding Ms. Aronov's disappearance, the NYPD also conducted an area hospital and morgue search for Ms. Aronov, collected and reviewed security/surveillance tapes from Ms. Aronov's building and buildings in the surrounding area, initiated a level 1 mobilization and foot canvass by the Manhattan North Task Force and other NYPD personnel, and conducted shoreline and rooftop searches via helicopters. Ex. KK, Samburski Tr. at 25, 31; Ex. MM, NYC 1251; Ex. II, NYC 1254-1255.

187. The NYPD also assigned no less than two detectives full-time to the Aronov investigation for at least the first forty-eight (48) hours of the investigation. Ex. KK, Samburski Tr. at 61-62, 72, 100.

188. In the first forty-eight (48) hours after Ms. Aronov was reported missing, the NYPD also investigated a handyman who worked at the Aronovs' home in the Hamptons, traveled to Bridgehampton, New York after Ms. Aronov was reportedly seen shopping in a grocery store there, explored a lead involving a possible extramarital love interest of Ms. Aronov, reached out to numerous friend, family members and neighbors, handed out flyers, and looked at the Aronovs' phone and financial records. Ex. KK, Samburski Tr. at 52-53, 85, 89; Ex. PP.

189. NYPD personnel also hung up posters regarding the Aronov disappearance around the Upper East Side of Manhattan. Ex. KK, Samburski Tr. at 103-04.

190. Ms. Aronov's body was ultimately recovered from the Queens, New York side of the East River on May 12, 2003. Ex. MM, NYC 1251.

Dated: April 29, 2013
      New York, New York               Respectfully submitted,

                                        **THOMPSON WIGDOR LLP**

                                        By: _____/s/_____

                                            Kenneth P. Thompson
                                            Douglas H. Wigdor
                                            David E. Gottlieb
                                            Tanvir H. Rahman

                                        85 Fifth Avenue
                                        New York, NY  10003
                                        Telephone:  (212) 257-6800
                                        Facsimile:  (212) 257-6845
                                        kthompson@thompsonwigdor.com
                                        dwigdor@thompsonwigdor.com
                                        dgottlieb@thompsonwigdor.com
                                        trahman@thompsonwigdor.com

                                        *Counsel for Plaintiff*