UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------- x

ELLE CARMICHAEL, , as Administratix of the Estate of
Romona Moore,

                                    Plaintiff,

                                             06-CV-1913 (NG) (VVP)

               -against-

THE CITY OF NEW YORK, et al.,

                               Defendants.

----------------------------------------------------------------------- x

## DEFENDANT CITY OF NEW YORK'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

 

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 788-1599

Of Counsel:

Arthur G. Larkin

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

ARGUMENT

    I.    Plaintiff Cannot Establish State Action ....................................... 1

    II.    Adequacy of Police Investigation - Plaintiff's Claim.................................5

    III.    Plaintiff Cannot Establish an Equal Protection
        Claim.........................................................................................7

        A.    Plaintiff's Purported Statistical Analysis is
            Insufficient ........................................................... 7

        B.    The Aronov Case as Compared to the
            Romona Moore Case.................................................. 11

        C.    Plaintiff Cannot Establish Causation as a
            Matter of Law ........................................................ 12

    CONCLUSION......................................................................................... 13

**Preliminary Statement**

In opposition, plaintiff fails to address many of the arguments the City advanced in support of its motion for summary judgment, and relies mainly on case law outside the circuit to suggest that summary judgment should be denied.  As shown below, in this unfortunate case, summary judgment should be granted dismissing plaintiff's complaint.

**Argument**

**I.      Plaintiff Cannot Establish State Action**

In opposition, plaintiff concedes that the conduct of Pearson and Hendrix was not "state action," but asserts predictably that the police department's alleged failure to investigate her missing persons complaint can satisfy the state action requirement.  She argues that "liability under the Equal Protection Clause can be imposed where the alleged injury resulted from the criminal conduct of a third-party non-state actor, when a claim is based on the *discriminatory refusal to provide police services*."  (Plaintiff Mem. at 10; emphasis in original)  In support, plaintiff relies on four decisions (one from the Second Circuit), but each is inapposite.

*Estate of Macias v. Ihlde*, 219 F.3d 1018 (9th Cir. 2000), for example, holds that municipal actors <u>cannot</u> be liable for injuries caused by the criminal conduct of third parties.  In *Macias*, the plaintiff alleged that her decedent, a female Latina, was denied equal protection because local police officers failed to enforce a series of orders of protection against her husband, who eventually shot and killed her.  The district court granted summary judgment dismissing plaintiff's Section 1983 claims.  The Ninth Circuit reversed, holding that even though the defendants could not be held legally responsible for the decedent's death, the plaintiff could still recover "nominal damages" if she could prove a denial of equal protection.  *Id*. at 1028.  In so holding, the court stated:  "It is well established that there is no constitutional right to be

protected by the state against being murdered by criminals or madmen." *Id.* (citations omitted).

Here, plaintiff seeks to recover that which the *Macias* court found that she could not, viz.,

damages for her daughter's death. *Macias* does not support her claims.

*Pyke v. Cuomo*, 258 F.3d 107 (2d Cir. 2001), presented fundamentally different facts. In

*Pyke*, the plaintiffs were Native Americans who lived on a reservation within New York State,

who claimed that the state police declined to enter the reservation to quell violent acts committed

by a group known as the Warrior Society. Plaintiffs alleged that the failure of the state police to

provide police services violated the Equal Protection Clause. After limited discovery, the district

court dismissed the complaint because the plaintiffs could not demonstrate that they were treated

differently from other "similarly situated non-Native Americans." *Id.* at 109. On appeal, the

Second Circuit reversed *(see id.*):

> It would be difficult, if not impossible, to find other individuals whose situation is similar
> to Native Americans living on a reservation and exercising a substantial measure of self-
> government independent of New York State. Plaintiffs would probably be incapable of
> showing similarly situated individuals who were treated differently. If the rule were as
> framed by the district court, police authorities could lawfully ignore the need of Native
> Americans for police protection on the basis of discriminatory anti-Indian animus. This
> is clearly not the law.

Significantly, the State did not dispute that it had declined to intervene during the events in

question, "because the Indian tribe exercises a considerable measure of self-governance on the

reservation, and because the violence … threatened the safety of the state police officers." *Id.*

*Pyke* involved state action fundamentally different from that alleged here, viz., state

officials' affirmative decision not to send police officers to a geographic area for certain reasons.

Obviously, the state could not lawfully withhold police services from one geographic area with

the intent to discriminate against the people who lived in that area – especially if, as alleged in

*Pyke*, the police had notice that violent acts were occurring in that area and police protection was

needed.[1]  The instant case, however, does not concern any decision by the City to withhold police services from any geographic area, or from one group in the aggregate.  Rather, plaintiff alleges that the police did not conduct a timely investigation into her specific complaint that her daughter had disappeared, and further alleges that the failure to do so allowed third parties – whose identities were unknown at the time of the complaint – to commit crimes against her daughter.  The facts are fundamentally different, and for this reason *Pyke* is inapposite.

*Watson v. Kansas City*, 857 F.2d 690 (10th Cir. 1988), like *Macias*, involves a "long history of domestic violence," *id*. at 692, and allegations that municipal officials failed to intervene appropriately to prevent injury to the victim.  *Watson* is not controlling in this circuit and is also factually distinguishable.  The defendants in *Watson* conceded that "action under color of state law" (also known as "state action") occurred, and also conceded that in the circumstances presented, "failing to provide police protection is subject to the Equal Protection Clause under Section 1983."  *Id*. at 694.  *Watson*, therefore, does not address the state action doctrine, or the question whether a municipality can be liable for the conduct of third parties.

In addition, the plaintiff in *Watson* reported five serious incidents of abuse over a three-year period but the police did not arrest her husband.  The plaintiff also adduced evidence that the police department trained its officers to "defuse" domestic violence situations "and to use arrest as a last resort."  *Id*. at 696.  The court found that the evidence was sufficient to raise questions of fact concerning municipal liability for the plaintiff's injuries.  *Id*.  The causal link between the state action (or inaction) and plaintiff's injuries was much more pronounced than the

_____

[1]      After remand and further discovery, the circuit eventually affirmed the district court's final order granting summary judgment on all claims.  *See Pyke v. Cuomo*, 567 F.3d 74 (2d Cir.), *cert. denied*, 558 U.S. 1048 (2009).  The circuit held that the decisions by state officials alleged to have been discriminatory were instead designed "to contain and limit the impact of the violence on a geographic area."  *Id*. at 78.

causal link here.  In contrast to police training in *Watson*, the NYPD does not train its officers to refrain from doing what the plaintiff claims they should have done, viz., conduct thorough searches for black missing persons.  Rather, the NYPD trains its officers to apply a race-neutral policy to missing persons complaints.

Finally, *Wright v. City of Ozark*, 715 F.2d 1513 (11th Cir. 1983), rejected plaintiff's claims against a local police department for deciding not to publicize a series of rapes.  The plaintiff, who was victimized by the rapist, claimed that if the rapes had been reported in local newspapers, she would have known about them and would not have gone out alone to visit a friend the night she was raped.  Concluding that plaintiff had failed to state a claim under Section 1983, the court held that "the due process clause of the constitution provides no basis for imposing liability through application of civil rights statutes on state officers who either negligently or even recklessly facilitate the criminal actions of a third party, absent some special relationship between the victim and the criminal or between the victim and the state officer."  *Id.* at 1516 (citations omitted).  The court also "assume[d] that [the defendants] … owe[d] a duty under the equal protection clause not to discriminate in providing law enforcement services," but added that plaintiff had failed to plead facts showing "intentional or purposeful discrimination." *Id.* (citations omitted).  For this reason the court rejected plaintiff's Equal Protection claim.

The foregoing decisions recognize the basic principle that a municipality may not withhold police protection from one group of persons on a legally impermissible basis, such as race or ethnic origin.  But none of these decisions involves even remotely analogous facts, and none supports plaintiff's claim that the failure to investigate her missing persons complaint adequately can ever give rise to a constitutional violation.  In the domestic violence cases, for example, the identity of the criminal third party was known for a long period of time, *see*

*Macias*, 216 F.3d at 1020-26 (one year); *Watson*, 857 F.2d at 694 (three years), but ignored by law enforcement, whereas here, the identities of Pearson and Hendrix were not known until after plaintiff's daughter was dead.  (Rule 56.1 Stmt., ¶¶ 51-53; Pl. Cntrstmt., ¶¶ 51-53)  And the only Second Circuit decision on which plaintiff relies, *Pyke*, is markedly distinguishable.

## II.   Adequacy of Police Investigation – Plaintiff's Claim

Plaintiff asserts that she is not claiming any entitlement to a police "investigation" but, rather, she claims an entitlement to police "services" which she differentiates from an "investigation."  (Plaintiff Mem. at 11-12)  We submit, however, that a denial of police services usually refers to police protection, which is fundamentally different from the claim plaintiff pursues here.  All of the decisions on which plaintiff relies are from other circuits, and most are factually distinguishable.[2]  *See, e.g., Neighborhood Action Coalition v. City of Canton*, 882 F.2d 1012, 1017 (6th Cir. 1989) (plaintiff who alleges that police "fail[ed] to respond to calls from a neighborhood because of the racial make-up of the neighborhood" adequately pleaded Equal Protection violation); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000), *cert. denied*, 531 U.S. 1080 (2001) (dismissing Section 1983 claim based on police officers' taking sides in dispute between neighbors, and stating in dicta that the "withdrawal of police protection, *as when the Southern states during the Reconstruction era refused to give police protection to their black citizens*, is the prototypical denial of equal protection") (emphasis added).[3]

---

[2]   The only Supreme Court decision plaintiff cites sets forth, in a footnote, the general rule that the state may not "deny protective services to disfavored minorities," but adds that petitioner made "no such argument" in that case.  *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 197 n.3 (1989) (dismissing Section 1983 claim based on failure to protect child from injury caused by third party) (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).  As defendants showed in their moving brief, *Yick Wo* is plainly distinguishable.

[3]   Notwithstanding the court's statement, Congress, when considering the scope of Section 1983, expressly rejected amendments that would have imposed liability upon municipalities for the crimes of third parties,

Continued…

*Elliot-Park v. Manglona*, 592 F.3d 1003 (9th Cir. 2010), concerns three police officers' on-the-spot "investigation" into an auto accident that occurred in Saipan.  The plaintiff, a Korean, alleged that the officers did not arrest the driver of the other vehicle who was plainly intoxicated, because he was Micronesian.  She also alleged that one of the three officers fully investigated another accident the same night where the injured party was Micronesian but the other driver was not.  *Id*. at 1006.  The defendant-officers conceded that plaintiff "pled facts from which a trier of fact could infer racial discrimination," *id*. at 1006, but asserted that they were entitled to qualified immunity.  The court rejected the officers' arguments, holding that "the discriminatory denial of investigative services may violate equal protection."  *Id*. at 1007.

We submit that the Second Circuit would not likely adopt the reasoning of *Elliot-Park* in the circumstances of this case.  *Harrington v. County of Suffolk*, 607 F.3d 31 (2d Cir. 2010), which also involved a police investigation into an auto accident, comes down heavily against second-guessing local officials' allocation of police resources.  *Id*. at 34-35.  If the police intentionally withheld from one minority group the services of its detectives, that conduct could raise constitutional problems.  Plaintiff presents no evidence of such a practice here, however.  Rather, she alleges that the NYPD's decision not to open an investigation immediately into her missing persons complaint violated her constitutional rights.  But that decision was an exercise of discretion in specific circumstances, exactly the kind of decision that the Circuit declined to review in *Harrington*.

Moreover, in *Elliot-Park*, the defendants conceded that the complaint sufficiently alleged racial discrimination, viz., that one of the individual defendants treated a similarly-situated

---

concluding that it could not constitutionally require local governments "to keep the peace."  *Monell v. Dept. of Social Services*, 436 U.S. 658, 693 (1978).

accident victim differently than the plaintiff the <u>same</u> night.  Here, in contrast, plaintiff does not

dispute, and therefore concedes, that no <u>individual</u> officer  to whom she reported her daughter

missing ever knew about the purportedly similarly situated missing person, Svetlana Aronov, but

nevertheless treated her differently.  Assuming <u>arguendo</u> that plaintiff had any constitutional

right to a prompt investigation of her missing persons complaint, she has failed to adduce any

evidence that an individual City actor violated that right intentionally (*see* Deft. Br., at 12-13).

One decision cited by plaintiff summarizes the problem with her arguments:  "If a merely

unexplained difference in police treatment of similar complaints made by different people

established a prima facie case of denial of equal protection of the laws, the federal courts would

be drawn deep into the local enforcement of petty state and local laws."  *Hilton*, 209 F.3d at

1008; *see also Harrington*, 607 F.3d at 34-35.  Because plaintiff had no constitutional right to an

investigation of her complaint, her claims should be dismissed.

### III.    Plaintiff Cannot Establish an Equal Protection Claim

### A.    Plaintiff's Purported "Statistical" Analysis is Insufficient

Plaintiff concedes that no individual City actor violated her rights intentionally, and relies

exclusively on her statistical expert's purported analysis of data to prove that the City engages in

a "persistent, widespread" practice of "fail[ing] to conduct immediate investigations for Black

missing persons."  (Pl. Br. at 12)  These arguments should be rejected.

<u>First</u>, as noted above and in the City's moving papers, because plaintiff cannot show that

an individual City actor violated her rights with the required state of mind, she cannot prove an

underlying constitutional violation.  (Deft. Br. at 12-13)  For this reason alone, the complaint

should be dismissed.  *City of Los Angeles v. Heller*, 475 U.S. 769, 799 (1986).  Plaintiff cannot

rely on statistics to meet her burden in this Section 1983 lawsuit, and her attempt to distinguish

*Reynolds v. Barrett*, 685 F.3d 193 (2d Cir. 2012), in a footnote, is unavailing.  Plaintiff

paraphrases one quote from *Reynolds* inaccurately, and asserts that *Reynolds* left open the

question "whether a plaintiff could rely on a 'disparate impact' theory" to establish a Section

1983 claim.  (Pl. Br., at 16 n.8, citing *Reynolds*, 685 F.3d at 201 n.7).

      Contrary to plaintiff's arguments, *Reynolds* holds that in order to establish an underlying

violation of the Equal Protection Clause in a Section 1983 lawsuit, plaintiff must plead and prove

"purposeful discrimination" which, in turn, requires proof of an individual state actor's

"undertaking a course of action because of, not merely in spite of, the action's adverse effects

upon an identifiable group."  *Reynolds*, 685 F.3d at 204 (citation omitted).  By failing to adduce

any evidence that a state actor decided not to investigate plaintiff's missing persons complaint

"because of" her race, plaintiff has failed to meet her burden.

      <u>Second</u>, even if plaintiff could show an underlying violation, the data on which she relies

does not reflect the existence of <u>one</u> other case, let alone a "persistent, widespread" pattern of

cases, where the NYPD did not open an immediate investigation into a black missing person

complaint.  Rather, the data reflects thousands of investigations into such complaints.  Plaintiff's

only argument is that the cumulative number of black missing persons complaints is less than the

national average - but that average necessarily includes some jurisdictions with higher figures

and some with lower figures.  The data for Brooklyn simply reflects a somewhat lower figure

than the average, but the data does not support the inference that when the NYPD receives a

complaint about a missing black citizen, it does not investigate that complaint the same way it

investigates a complaint about a missing white citizen.  Plaintiff therefore cannot demonstrate

any link between the data on which she relies and the injury she claims to have sustained, which

renders the data irrelevant and not probative. *E.g., City of Canton v. Harris*, 489 U.S. 378, 385

(1989) (plaintiff must plead and prove "direct causal link" between the municipal policy or custom and the constitutional violation she claims).

It bears emphasis that plaintiff's missing persons complaint about her daughter <u>appears in the NYPD missing persons database.</u> (Reply Dec., Exh. K [missing persons database printout, MP #302232])[4] To the extent she claims that other, unnamed, unidentified reports about black missing persons do not appear in the database, a supposition she infers from her "expert" statistician's report, that argument is irrelevant.

<u>Third</u>, plaintiff's "expert" report failed to control for <u>any</u> variables that could explain why the data for Brooklyn reflects a lower percentage of blacks among its missing persons than the national average. The expert failed to address demographic or sociological factors that could explain why the figure is lower than the average, failed to compare the rates in New York to other large cities, and otherwise failed to offer any explanation whatsoever for why the figure is somewhat lower than the national average. He refers to one study which "notes that 'a lower proportion of people from ethnic minorities may be reported missing to the police'" (Larkin Dec., Exh. H, ¶ 4), one possible explanation for why the data in Brooklyn may reflect a lower percentage of black missing persons than the national average. But he fails to address this alternative explanation, and fails to offer up any explanation, for the difference in the data. He offers the raw data comparison and nothing else. The failure to include <u>any</u> controls renders the statistical analysis irrelevant and inadmissible.

In *Bickerstaff v. Vassar College*, 196 F.3d 435 (2d Cir. 1999), *cert. denied*, 540 U.S. 1242 (2000), the Second Circuit affirmed the district court's order excluding an expert report that

---

[4] The missing persons report appears in the database bearing the same number, MP # 302232, as appears on the printout. (Reply Dec., Exh. L [database excerpt])

omitted the "major" independent variables that could have affected the dependent variable. *Id*. at 449.  The court distinguished between statistical analyses that did not necessarily account for all variables, which affected weight rather than admissibility, and those that omitted the important variables:  "The critical distinction that [plaintiff] misses, … is that in the present case the district court did not reject [her expert's] regression analysis because it included less than all the relevant variables; rather, it found the evidence not probative because it omitted the major variables." *Id*. (citation omitted).  For this reason, the regression analysis was "so incomplete as to be inadmissible as irrelevant." *Id*. (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)).

We submit that, *a fortiori*, if a statistical analysis that omits "major" variables is inadmissible, an analysis that omits all variables - or, stated differently, one that includes none of the relevant variables - is likewise inadmissible. *See also Raskin v. Wyatt Co*., 125 F.3d 55, 67-8 (2d Cir. 1997) (excluding expert report in age discrimination case, because the report "assume[d] that any anomalies in the [defendant's] data must be caused by age discrimination, and ma[de] no attempt to account for other possible causes").  Plaintiff fails to address *Bickerstaff* or the other decisions cited in defendant's moving papers in any meaningful way, and otherwise asserts, incomprehensibly, that her expert "controlled" for "age" and "geographic location by using various geographic benchmarks" in his purported analysis.  (Pl. Br., at 17)[5]

This omission is all the more egregious in light of the expert's acknowledgment that the data he analyzed has severe limitations.  He states that (i) "data on missing adults are not generally available, and, when available, such data are typically not available in a form that is

---

[5]    Plaintiff purports to distinguish *Ackerman v. Oryx Communications, Inc*., 810 F.2d 336 (2d Cir. 1987), on the grounds that the case involved claims under Section 11 of the Securities Act of 1933.  (Pl. Br., at 18 n.9)  But this fact is immaterial to the court's analysis of expert testimony.

suitable for detailed analysis"); (ii) "research studies concerning missing persons in the United States are … rare" and the rarity of these studies represents "a major gap in the professional literature"; (iii) "even if data on missing persons were readily available, such data would have to be used and interpreted with great care [because] … the definition of 'missing' raises difficult and complex conceptual issues"; and (iv) most importantly, "reported data on missing persons may not always be reliable."  (Larkin Dec., Exh. H, ¶¶ 2-4)  But plaintiff's expert fails to address any of these limitations in his report; for example, he fails to compare the definition of "missing" across jurisdictions, or to analyze how differences in definition might account for some of the statistical difference between Brooklyn and other areas.  For these reasons, his opinions are inadmissible.  *See generally* Fed. R. Evid. 702 (expert testimony admissible only if based on "sufficient facts or data" and if it "is the product of reliable principles and methods").

### B.      The Aronov Case as Compared to the Romona Moore Case

Plaintiff argues the facts of the Aronov and Moore cases, asserts that the two are comparable and claims that, for this reason, Ms. Moore was a Category G disappearance.  In an exercise of discretion, however, the NYPD disagreed that Ms. Moore's disappearance fell within Category G, and in this Circuit, after *Harrington*, plaintiff has no recourse under Section 1983 with regard to that decision.  Plaintiff offers no evidence that police officers or detectives intentionally discriminated against her by not classifying Ms. Moore's disappearance as falling under Category G, except for the purported statistical disparity in the data.  But this alleged disparity is not evidence of a pattern of discrimination, and absent an analysis of other variables the statistics prove nothing.  The undisputed facts clearly show that the NYPD's decisions with regard to the Aronov and Moore cases were reasonable, even if plaintiff disagrees with them.

Even though the City produced a massive database with entries for over Twenty-seven Thousand (27,000) missing persons cases, plaintiff has failed to point to one other, specific case where the NYPD did not investigate a black missing persons complaint immediately, because of the missing person's race.  The failure to identify any other cases is fatal to plaintiff's <u>Monell</u> claim, even if the court were to conclude that there was any evidence of intentional discrimination in her case.  *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) ("evidence of one instance" of alleged violation cannot support <u>Monell</u> claim).

### C.  **Plaintiff Cannot Establish Causation as a Matter of Law**

Plaintiff applies the wrong legal standard for causation, misstates the undisputed facts and fails completely to address the standards for admissibility of her purported canine expert's opinions.  For these reasons plaintiff's arguments regarding causation should be rejected.

Quoting a 23-year old opinion from another circuit, plaintiff asserts that "as long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."  (Pl. Br. at 21, quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990))  Recent Supreme Court decisions set forth a different, far more stringent standard of causation, however:  "[R]igorous standards of culpability and causation must be applied [in <u>Monell</u> cases] to ensure that the municipality is not held liable solely for the actions of its employees."  *Board of County Commissioners v. Brown*, 520 U.S. 397, 406 (1997).  Plaintiff cannot meet this standard here.

<u>First</u>, plaintiff asserts that a simple door-to-door canvass of the area where Ms. Moore disappeared would have found her.  She claims that the place where Ms. Moore was last seen was the residence of her friend, Gary Williams, just a few houses away from the place where she was kidnapped.  But police investigators did not learn that Ms. Moore had gone to see Mr.

Williams until they interviewed him on April 28, 2003 (Rule 56.1 Stmt., ¶¶ 44-46; Pl. Cntrstmt.,

¶¶ 44-46), by which time Ms. Moore was already dead.  Given the information supplied by Ms.

Carmichael on the morning of April 25, 2003, police would not have known to canvass the area

around Mr. Williams' residence because they did not know that Ms. Moore had gone to visit him

the night before.[6]  Plaintiff's arguments about the canvass are speculation.

     <u>Second</u>, plaintiff's canine "expert" Lisa Harvey's opinions are speculative and

inadmissible.  Plaintiff fails completely to address either the caselaw concerning *Daubert*

standards for police canine evidence or Ms. Harvey's admissions at her deposition that she could

not possibly say how long it would have taken a bloodhound to find Ms. Moore or which

direction the bloodhound would have walked.  Moreover, plaintiff acknowledges that Ms.

Harvey assumed that the canine trail would have started at Mr. Williams' residence, a "very

close and straight path" to where she was held captive, but when plaintiff first reported her

daughter missing she did not tell the police that Ms. Moore had gone to see him the night before,

and police did not learn this fact until after she was already dead.  Ms. Harvey's opinion is

therefore based on an incorrect understanding of the facts.

---

     [6]    Ms. Carmichael claims that she told officers that she had called her daughter's "friend" Gary to find out where she was, but she did not tell the officers Gary's full name and cannot recall giving them his phone number. (Thompson Dec., Exh. A, at 17-18)  Plaintiff's contention that she gave the officers specifics about Gary Williams are undermined by the factual record.

## <u>Conclusion</u>

For the foregoing reasons, defendants' motion should be granted and the complaint

should be dismissed with prejudice.

Dated:       New York, New York
             June 17, 2013

                         Respectfully submitted,

                         MICHAEL A. CARDOZO
                         Corporation Counsel of the City of New York
                         *Attorney for Defendants*
                         100 Church Street
                         New York, New York 10007
                         (212) 788-1599

                       By:             /s/
                            Arthur G. Larkin (AL 9059)
                            Senior Counsel